(37 App. Div. 601.)

## CLINTON NAT. BANK v. NATIONAL PARK BANK OF NEW YORK.

(Supreme Court, Appellate Division, First Department.　February 24, 1899.)

**1. APPEAL—HARMLESS ERROR.**

Where the facts are undisputed, and the question arising thereon is one of law, it is immaterial that the court submitted the question to the jury, on a charge not correct in all particulars, if the jury reached the proper conclusion.

**2. BANKS—NEGLIGENCE.**

Where a bank has undertaken to negotiate a loan for another, it is bound to use the ordinary care which is customary and usual among bankers engaged in such transactions, under similar circumstances, whether it is acting gratuitously or for a consideration.

**3. SAME—ACCEPTING SPURIOUS COLLATERAL—EVIDENCE.**

In an action against a bank for negligence in accepting spurious bonds as collateral security for a loan made with plaintiff's funds, to a person then in good standing, it appeared that defendant's clerk merely examined the outside of the bonds, to see that they were of the proper amount, without making any examination as to their genuineness. *Held*, that evidence that an examination of such a character was customary among bankers, under similar circumstances, accustomed to make loans on such bonds as collateral, and that great reliance was placed by them on the character of the persons to whom the loans were made, was admissible to show that defendant used ordinary care.

**4. SAME.**

A bank is not chargeable with negligence for receiving spurious bonds as collateral for a loan which it was negotiating for another, where the latter accredited the person who delivered the bonds and obtained the loan as safe and trustworthy to deal with, and the bank made such examination of the bonds as was usual and customary among bankers under similar circumstances, though a careful examination might have enabled it to ascertain that the bonds were not genuine.

Appeal from trial term, New York county.

Action by the Clinton National Bank against the National Park Bank of New York. From a judgment for defendant, plaintiff appeals. Affirmed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, PATTERSON, and O'BRIEN, JJ.

S. Hanford, for appellant.

Lewis Cass Ledyard and Louis F. Doyle, for respondent.

RUMSEY, J. The action was brought for damages which the plaintiff claimed to have sustained by reason of the negligence of the defendant in accepting spurious bonds as collateral security for a loan made with the plaintiff's funds at the defendant's place of business and by its officers, in pursuance of directions given by the plaintiff to the defendant. At the close of all the evidence in the case, each party moved for the direction of a verdict in its favor, and neither asked that any question should be submitted to the jury. The learned justice, however, who presided at the trial, submitted to the jury the question whether the defendant's officers, in taking the securities which were presented to it, exercised the ordinary and customary care of bankers under similar circumstances, instructing them that, if the defendant's officers did exercise such care, then the defendant was not liable. The jury rendered a verdict for the de-

fendant. A motion for a new trial was denied, and, after the entry of judgment on the verdict, this appeal was taken from the judgment and order denying the new trial.

There is not the slightest dispute as to the facts. The Clinton National Bank was, as its name implies, a banking corporation. It did business at Clinton, in the state of Connecticut. For some time before 1893 the National Park Bank, in the city of New York, had been the correspondent in that city of the plaintiff, and the plaintiff had kept with it its account; its average daily balance in the Park Bank being about $12,000, upon which interest was paid to it. The plaintiff was accustomed to send to the defendant all checks, notes, time drafts, and notes for collection, payable at places in the city of New York, and points west and south of that city, except Philadelphia. A certain charge was made by the defendant for collecting checks outside of the state of New York, and the collections as made were put to the credit of the plaintiff in the defendant's books. In the ordinary course of business no charge was usually made, for these services, against the plaintiff. Quigley & Tuttle were brokers, doing business in the city of New York, and on the 12th of July, 1893, they were in good standing and credit among business men in that city. Shortly before that time, that firm made by mail an application to the plaintiff bank to borrow $5,000 on $7,000 city of Davenport, Iowa, 6 per cent. improvement bonds, suggesting in the letter that they would be glad to have the collateral left at the National Park Bank, so that they (Quigley & Tuttle) could obtain it when the bonds should be sold. In reply to that letter, on the same day, the cashier of the plaintiff accepted the loan by telegram, and also wrote to Quigley & Tuttle a letter to the same effect, and saying to them, besides, that the plaintiff had advised the Park Bank to receive of them their note for $5,000, payable on demand, at the Park Bank, to the order of the plaintiff, with $7,000 city of Davenport, Iowa, 6 per cent. street-improvement bonds collateral, and requesting that bank to hold the collateral for safe-keeping, forward the note to the plaintiff, and hand to Quigley & Tuttle the plaintiff's check for $5,000. On the same day the cashier of the plaintiff wrote to the defendant a letter, of which the following is a copy:

"Clinton National Bank.

"Clinton, Conn., July 12, 1893.

"Geo. S. Hickok, Esq., Cashier National Park Bank, N. Y.—Dear Sir: Please receive of Messrs. Quigley & Tuttle their demand note for $5,000, payable to our order at the National Park Bank, rate seven per cent., with $7,000 city of Davenport, Iowa, six per cent. street-improvement bonds as collateral, and hand them the inclosed draft on you for $5,000. Kindly hold the collateral for this bank for safe-keeping, and forward the note to me.

"Yours, truly,                          [Signed]   E. E. Post, Cashier."

On the 14th of July Quigley & Tuttle delivered to one of the clerks of the defendant, at the bank, their note for $5,000, and at the same time there were presented to the clerk seven papers, purporting to be bonds of the city of Davenport, for $1,000 each. The clerk received the papers, ran the bonds over, looking at the back of them to see that the amount called for in the letter of instruction was

there, and, upon ascertaining that fact, delivered to Quigley & Tuttle the plaintiff's check for $5,000. On the same day the plaintiff was advised that the transaction had been completed, and the note for $5,000 was sent to it; the defendant stating to it that the bonds were held in safe-keeping for its account. The loan to Quigley & Tuttle was outstanding until 1895, the makers of the note paying the interest upon it as it became due. In the month of January, 1895, Quigley & Tuttle became insolvent, and it was ascertained that they had been procuring loans, and depositing as collateral to them forged and spurious municipal city bonds. This fact having come to the knowledge of the plaintiff's officers, its president and cashier called at the National Park Bank on the 22d of January, inquired for the Davenport bonds, and in response to that inquiry the papers which had been turned over by Quigley & Tuttle in July, 1893, were delivered to them. It was ascertained that these papers were not obligations of the city of Davenport, but were entirely spurious, and of no value. Upon ascertaining that fact, this action was brought for the damages which the plaintiff had suffered because of the receipt by the defendant bank of these spurious obligations, instead of genuine bonds of the city of Davenport, which it had been directed to receive.

Upon the trial it was conceded that the papers received from Quigley & Tuttle were not genuine obligations of the city of Davenport. Upon inspection it was shown that, while they purported to be obligations of that city, they were not sealed, nor did they purport to be attested by the seal of the city. They were signed with the name of a person as mayor, and contained a statement that they were countersigned and registered, and this statement was signed by another person as city clerk; but it was made to appear that no persons bearing the names signed to these papers had ever been either mayor or city clerk of the city of Davenport, Iowa. It also appeared, by an examination of the papers, that the bond and the coupons had been printed upon separate sheets of paper, of a little different shade, but carefully pasted together, and that the whole was so folded that that fact did not appear. It would, however, have appeared, if the bonds had been opened and examined. The person who took the note and papers from Quigley & Tuttle testified that he did not open the bonds, but satisfied himself, by examining the outside, that the number of bonds required was delivered. Several persons were examined as witnesses, who had been in the habit of dealing in bonds of municipalities of different Western states, all of whom, with one exception, testified that they had never seen or known a municipal bond without a seal. One of the witnesses, however, whose business was dealing in municipal bonds, testified that, under the laws of different states, there were many municipalities which did not use seals, and which sometimes issued bonds, and that, while most municipal bonds were sealed, he had seen genuine bonds of that nature bearing no seal. He testified, further, however, that he had no recollection of having seen bonds of any city which were not attested by the seal of the city. It was proved by the evidence of officers of various banks of the city of New York, who were accustomed to making loans upon bonds and securities of that nature as

collateral, that the business was done very largely upon confidence; that is to say, that such transactions took place only with persons who were in good credit, and whose character as honest dealers was to be depended upon. It was further shown that the almost invariable custom of bankers in receiving such collateral was to examine the outside of the security, to see whether it purported to be of the amount called for. The only other examination given to them was to see whether the going coupon was attached to the bond, and if the bond purported to be registered, whether it bore the certificate of registration. All the witnesses agreed that no examination was ever made as to the genuineness of the bonds, but that, in regard to those matters, the securities offered were taken upon the credit of the person to whom the loan was made. These facts were undisputed.

The plaintiff claimed that it was the duty of the defendant's officer, upon receiving these securities from Quigley & Tuttle, to examine them, and that it should not have received them without such examination. It claimed, further, that the defendant should have been charged with whatever fact it might have discovered upon such an examination, and that, as upon an examination it would have learned that the seal of the city of Davenport was not attached to the papers, and that the coupons and bonds were printed upon paper of a different shade, and not upon the same sheet, those facts would have put it upon inquiry as to whether the papers offered were genuine obligations of the city of Davenport, and that it was its duty to make such inquiry, and that, as upon making such inquiry it was fair to infer that it would have ascertained that the papers were not genuine obligations, it was chargeable with that knowledge, and for that reason that it was guilty of negligence in receiving the papers presented as security for the loan. The defendant, on the contrary, insisted that it was called upon to exercise only such care as was ordinarily used by bankers in the city of New York in transactions of the same kind, and that, as the evidence was undisputed that its officer, on receiving these papers, gave them the usual examination, it had performed all the duty which it owed to the plaintiff, and therefore, as a matter of law, it was not guilty of negligence, and not liable to respond to the plaintiff for the damages which it had suffered. The question presented here is, which of these two claims is the correct one?

When, at the close of the testimony, each party moved that a verdict be directed in its favor, and neither requested to go to the jury, it was substantially conceded that there was no question of fact for the jury, and the learned court would have been perfectly justified in deciding the question as one of law. Clason v. Baldwin, 68 Hun, 404, 23 N. Y. Supp. 50. Although he saw fit to submit the question of negligence to the jury, that fact is not of importance, if the jury reached the proper conclusion; and, if they did so reach it, it is not material whether or not the charge of the court was correct in all particulars. People v. O'Neil, 49 Hun, 423, 4 N. Y. Supp. 119; Ming v. Corbin, 68 Hun, 161, 22 N. Y. Supp. 647. If a correct result was reached, the process by which it was done is not material. We do not mean to say that the charge was not correct, but only that, for

the reason stated, we do not feel called upon to examine whether it was or not.

It is claimed by the defendant that it acted gratuitously in receiving this loan for the plaintiff. If it were material to determine that question, we would have some hesitation in conceding that claim. Exchange Nat. Bank of Pittsburgh v. Third Nat. Bank of New York, 112 U. S. 276, 288, 5 Sup. Ct. 141; Allen v. Bank, 22 Wend. 215 (per Verplanck, senator), 228, 229. But we do not regard that fact as material in this connection. Whether the defendant acted gratuitously, or whether the taking of this loan was a part of the business which, as correspondent of the Clinton Bank, it was to do, so that the collection fees which it received, and the other benefits which it had from the business, were a consideration for its services in this regard, is not very material. Having undertaken to do the business for the plaintiff, it was bound to use the ordinary care which was customary in the transaction of business of that nature; and, whether it did the work gratuitously or for a consideration, the nature of its duty was not changed. So the question comes whether, upon the facts stated, it can be said that the defendant used proper care in the transaction of this business.

For the purpose of enabling the court or the jury to determine that question, it was undoubtedly proper for the defendant to show the manner in which it was customary to transact business of that nature. While the criterion of proper care in such cases is the exercise of such reasonable diligence as the ordinarily prudent man would apply in the transaction of the particular business, the question what is such ordinary care must always be determined by evidence of the usual manner of doing that business by men who are accustomed to it. Allen v. Bank, 22 Wend. 215–226; Leach v. Beardslee, 22 Conn. 404; Maynard v. Buck, 100 Mass. 40.

In the case of Isham v. Post, 141 N. Y. 100, 35 N. E. 1084, the action was brought for the conversion of certain money, which had been delivered by the plaintiff to the defendant, to be lent for the plaintiff, and to be returned upon demand. It was shown that the plaintiff had demanded the money, and that the defendant had not returned it. The court of appeals held that, when that proof was made, the plaintiff's case was made out, and the duty then devolved upon the defendant of showing an affirmative defense. The defense which he sought to prove was that the money was lost without his fault, and by an event for which he was not to blame, because he had performed his duty faithfully, and without negligence or misconduct. He had lent the money upon certain securities as collateral, but it turned out that the securities, which were certificates of stock, had been raised, so that they represented many more shares than were transferred by the original securities. It appeared in the case that the defendant was a dealer in choice stocks, and had issued to the plaintiff, among others, a circular so advertising himself, and promising to his customers careful attention in all commercial transactions. The court held that those who dealt with him contracted for, and had a right to expect, a degree of care commensurate with the importance and the risks of the business to be done, and the skill and capacity

adequate to its performance. It is apparent that the holding of the court in that case, even if it were necessary to its determination, was based very largely upon the representations of Post that he would give careful attention to the affairs which were intrusted to him by any customer. The question actually decided in the case was that it was error to refuse evidence, offered by the defendant, which would have shown that the. defendant exercised the same care in the transaction which he exercised in his own matters. The court said that such evidence was material, and that it would have tended to show that the defendant was not in fault for not discovering the forgery.

It was not error, therefore, for the court, in this case, to receive evidence of the manner of doing business of this nature at the different banks in the city of New York. Such evidence was not received as tending to show a custom by which the plaintiff was bound, because he was acquainted with the usage, but to enable the jury, if the case came to them, to say what was the ordinary and usual way, among dealers, of doing this kind of business, so that they might have a standard by which to measure the care used by the defendant, and ascertain whether or not he used the care which the law required of him. Maynard v. Buck, 100 Mass. 40, 48. That evidence established that, in the transaction of business of this kind, great reliance was put, by everybody engaged in it, in the character of those to whom the loans were made, the credit given to them personally, and that the collateral was taken in reliance upon the character of the persons who obtained the loan, and that it would have been impracticable, having in view the number of such transactions, and the limited time ordinarily afforded in which to complete them, to do anything more than to give to the securities, as they were presented, such a cursory examination as would enable the person receiving them to see that they corresponded in the general description and in amount with the securities agreed to be delivered. The evidence showed, too, that there were no means of ascertaining the genuineness of the signature upon the bonds of these municipalities, situated in various states, and at a great distance from the place where the business was transacted, and signed, as they were, by men whose terms of office were usually short, and about whose existence as officials it would be almost impracticable to ascertain the facts.

The court, then, was bound, in determining the question whether the defendant was guilty of negligence, to assume as a fact that this was the ordinary and usual manner of transacting business of this nature, and the only question remaining was whether the defendant exercised that ordinary and usual care. In determining that question, it is an important fact that the thing to be done by the defendant was simply the receipt of the papers from Quigley & Tuttle. The bargain for the loan had been made by the plaintiff itself. The amount of the loan, and the voucher to be given for it, and the amount and nature of the securities, had been determined by the plaintiff. As to all that the defendant had nothing to say. When the plaintiff dealt with Quigley & Tuttle, and sent them to the defendant's place of business to complete the transaction, it accredited them, so far

as the defendant was concerned, as proper and safe persons with whom to deal. When those persons brought to the defendant what they said were the papers they were to deliver, they came there with a certificate of character from the plaintiff, as persons with whom it was safe to deal, and who were to be trusted to deliver to the defendant, for the plaintiff, the securities which the defendant was to receive. Quigley & Tuttle, therefore, came to the defendant as persons in whom that trust and confidence might be reposed which careful dealers were in the habit of insisting upon before they advanced money to them upon collateral securities. When, therefore, they presented themselves at the counter of the defendant's bank, bringing what they said was the security which the plaintiff had agreed to receive, and what the plaintiff had advised the defendant it had agreed to receive, the only duty of the defendant was to give those papers, there presented, the same examination which it would have given to them, had they been presented by a person with whom it had made such a bargain on its own account, and in whom it reposed that trust which was an essential requisite to the making of these loans. If that duty was performed, then it was quite clear that the defendant was not guilty of negligence, although it might turn out that the obligations were not genuine, and although a careful examination might have enabled it to ascertain that fact. All the examination that it was required to give was such as was customary among bankers engaged in the same transactions under similar circumstances. Allen v. Bank, 22 Wend. 215, 225. That they did use such diligence was not in dispute, and, when the evidence was closed, the defendant was entitled that the verdict should be directed in its favor upon the undisputed facts. This precise point has been under examination in two cases in the courts of Great Britain which are called to our attention (Woods v. Thiedemann, 1 Hurl. & C. 478; Bank v. Synnott, 5 Ir. R. Eq. 595), in each of which the conclusion reached was as was reached here.

The principles laid down in this opinion dispose of the various objections and exceptions taken to the rulings of the court and upon the admission of evidence. For the reasons given above, we conclude that the judgment and order were correct, and must be affirmed, with costs to the respondent. All concur.