People ex rel. Reidy v. Grady, 26 App. Div. 592, 50 N. Y. Supp. 424, while not deciding this precise question, supports the authority of the principles underlying the De Vries Case, supra. This court has recently taken occasion to criticise procedure such as that in-. dulged in by the commissioner toward this relator. In People ex rel. Callan v. Partridge, 87 App. Div. 573, 84 N. Y. Supp. 487, Mr. Justice Bartlett, writing for the court, said:

"Where a member of the police force is tried before a deputy commissioner, there should be an express finding one way or the other by that officer, declaring the accused guilty or not guilty of the charge against him, and this finding should be set out in writing in the report of the proceedings made to the head of the police department."

It follows that the act of the commissioner in dismissing this relator from the force was without authority and void, and the determination should be reversed, with costs. All concur.

---

RING v. LONG ISLAND REAL ESTATE EXCH. & INV. CO.

(Supreme Court, Appellate Division, Second Department. April 15, 1904.)

1. CORPORATIONS—AUTHORITY OF AGENT—ESTOPPEL ON PRINCIPAL.

Where the secretary of a real estate investment company, having full charge of its affairs, receiving all moneys, preparing all papers and the like, received a sum for investment in real estate with the approval and acquiescence of the president, such act being within the apparent scope of his duties, the company was estopped to deny that it had received the money.

2. SAME—PERSONAL TRANSACTIONS OF AGENT—EFFECT ON PRINCIPAL'S LIABILITY.

The fact that an investor, after having become acquainted with the secretary of an investment company, who was also a lawyer, through her dealings with the company, consulted him with reference to certain independent legal matters, did not affect the liability of the company to her for funds invested by her with it through the secretary, and embezzled by him.

3. SAME—DEALINGS WITH AGENT—EVIDENCE—SUFFICIENCY.

Facts held insufficient to show that an investor dealt with the secretary of an investment company as an individual, and not in his official capacity as the company's representative.

4. SAME—ULTRA VIRES ACTS—ESTOPPEL.

Where an investment company received money for investment it could not be heard to say, as against the investor, that the investment contemplated was ultra vires.

5. SAME—INVESTMENT COMPANIES—FRAUD OF AGENTS—LIABILITY OF COMPANY.

Where an investment company accepted money for investment, the investor had a right to rely on a fair performance by it of the obligation assumed to invest or return the money, and the company could not discharge itself from that obligation by showing that the investor accepted from the company's officer a forged mortgage purporting to run directly from the borrower to her.

6. SAME—REPRESENTATIONS OF AGENT—LIABILITY OF PRINCIPAL.

A statement, made by the secretary of an investment company to an investor, in the presence of the president, that the company owned certain lots, and had sold them to another, who was giving a mortgage back,

---

¶ 4. See Corporations, vol. 12, Cent. Dig. § 1557.

which they would have made directly to the investor, amounted to an assurance by the company that it was about to take a mortgage on the property, but instead transferred it to the investor for her investment, and the company was liable to the investor where the mortgage turned out to be in fact a forgery perpetrated by its secretary.

Appeal from Kings County Court.

Action by Elizabeth Ring against the Long Island Real Estate Exchange & Investment Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Argued before HIRSCHBERG, P. J., and BARTLETT, JENKS, WOODWARD, and HOOKER, JJ.

Robert H. Wilson, for appellant.
Isidor Buxbaum, for respondent.

JENKS, J. I am of opinion that the evidence is sufficient to sustain the finding of the learned county court that the defendant received $1,500 of the plaintiff for investment on bond and mortgage. The defendant is incorporated under the name of "Long Island Real Estate Exchange and Investment Company" for the purpose of taking, holding, and possessing real estate and buildings, and selling, leasing, and improving the same. It bought farms, divided them into building lots, took back purchase-money mortgages, assigned such mortgages, and exchanged properties. It maintained an office in this borough. On one window thereof was displayed the sign "Long Island Real Estate Exchange and Investment Company. Ignatz Martin, President. Sydney H. Carr, Secretary," and on the other, "Property Sold and Exchanged." The visitor passed through a railing to find the desk of Secretary Carr on the right and of President Martin on the left. Near Carr's desk stood a safe, marked with the name of the corporation. The secretary and treasurer and a former vice president of the company testifies that Carr, in the discharge of his office, was at his desk almost every day for almost all of the day; that Carr had charge of the books, and made the entries therein, drew up bonds, mortgages, deeds, contracts, assignments, and all papers on behalf of the corporation, and received and collected all moneys which came into the office. The treasurer had no desk in the office. He came there only occasionally, as the board meetings required his attendance, and his duties were practically assumed by Carr, who deposited the moneys in the bank, and who had charge of the bank account. There were seven directors who theoretically held weekly meetings, but who practically held them only when deemed necessary. Carr reported to the board, and it investigated and passed upon his report. For aught that appears, there was no officer or director or representative of the corporation in attendance at the office save the president, Martin; and the constancy or length of his attendances does not appear. The conclusion is irresistible that Carr, the secretary of the company, so far as the daily routine of its business was concerned, was the active man—the factotum—of the company, and that almost all of its transactions were managed and controlled by him, subject to reports to the board. This state of affairs was, of course, due entirely to the passiveness or phlegm of the other officers and of the directors of the corporation.

To this office practically in the control of Carr, or at least under his control with the president sitting by him, came the plaintiff. She, as one seeking investment, was introduced to Carr as the secretary of the company, and she came to know Martin as the president. She came again, and told Carr that she had $4,000 to invest. Carr told her that he would take $1,500 thereof, and, after talking with Martin, said they would give her a mortgage on a house on Pulaski street, owned by the company, and that they would take the remainder of her $4,000 later. The plaintiff drew $1,500 from her bank, gave it to Carr in the presence of Martin, and received a bond for the money, and a receipt signed by Carr, and possibly by Martin also, but no mortgage. At the interval of a week she came again, and Carr told her that they would take the remaining $2,500 on property in Jamaica, and Martin confirmed this statement. Carr told her that Mrs. Peters owned the property, but that the company controlled it. She paid the $2,500 in cash to Carr at his desk, Martin standing by. Carr counted it, and it was put in the safe marked with the defendant's name. The plaintiff thereupon received a bond and mortgage for $2,500. The bond was executed to the plaintiff by Mrs. Peters, Carr, and Martin individually, and the mortgage was executed to the plaintiff by Mrs. Peters. No complaint is made as to this mortgage. Later the plaintiff was informed by Carr that the company had disposed or had lost control of the Pulaski street property proposed as security for the $1,500 investment, but that it would substitute other land owned by the company in Flatbush. Martin confirmed this statement, and a map of the land was then exhibited. Thereafter Carr, Martin, and the plaintiff went to view the land. The plaintiff was thereafter told by Carr that one Bender had purchased the land, but was giving back a mortgage which would be made to her directly in her own name. The plaintiff gave up her receipt and her bond, and took the mortgage. For aught that appears, Bender is a myth. Certainly he never owned the land. The plaintiff never investigated the matter, but was lulled to sleep by payments of interest made at the defendant's office by Carr, who took some receipts running to Bender. The mortgage was a forgery. Carr was a thief, and after a time fled the jurisdiction. The defendant repudiates the entire transaction.

I think that it cannot be heard to deny the receipt of the $1,500. The defendant held itself out as a real estate investment company, and permitted its business to be entirely managed and controlled by Carr. At least, so far as its business was subject to any daily inspection or supervision, it was only to that of Martin. And the plaintiff says that in all matters, so far as Martin concerned himself, he approved and ratified all that Carr did in receiving the money and in investing it. I do not mean to say that Martin was party to Carr's thefts or forgeries. Far from it, for there is not the slightest proof of this, but that does not alter the effect of his conduct so far as this plaintiff is concerned. Martin may have supposed—and I give him the credit that he did suppose—that Carr would invest the money, or had invested it. But, in any event, the evidence is clear that the other officers of the defendant were lax to the last degree, and that the only officer who appears to have participated in the business was blind or was hoodwinked. Here,

then, is a real estate and investment company which permitted its routine affairs to be wholly managed by one man, and who invited investors in real estate. When the plaintiff entered the office to make an investment, to whom else could she apply? She had the assurance of the secretary, whose acts were affirmed by the president. The company held itself out as an investment company. The plaintiff was told by the secretary and by the president that it would accept her money for investment, and it was thereupon paid to and accepted by them. In one instance it was deposited in the safe of the defendant in the presence of the plaintiff. There can be little doubt, to say the least, that Carr, as secretary, was clothed by the defendant with the apparent authority to receive that money for investment, and, so far as the plaintiff is concerned, it is enough if the acts or the omissions of the defendant gave Carr such apparent authority. The principle is well stated by Brown, J., in Edwards v. Dooley, 120 N. Y. 540, 551, 24 N. E. 827, 829:

"While a principal is bound by his agent's acts when he justifies a party dealing with his agent in believing that he has given to the agent authority to do those acts, he is responsible for only that appearance of authority which is caused by himself, and not for that appearance of conformity to the authority which is caused only by the agent. That is, he is bound equally by the authority he actually gives and by that which, by his acts, he appears to give. For the appearance of authority he is responsible only so far as he has caused that appearance."

See, too, Timpson v. Allen, 149 N. Y. 513; 519, 44 N. E. 171.

The act of Carr in receiving the money as for the defendant for an investment was connected with the "semblance of authority which he possessed as the defendant's agent," within the limitation expressed in M. L. Ins. Co. v. F. S. S. & G. S. F. R. R. Co., 139 N. Y. 146, 34 N. E. 776, reiterated in Knox v. Eden Musee Co., 148 N. Y. 441, 457, 42 N. E. 988, 31 L. R. A. 779, 51 Am. St. Rep. 700. If not within the exact letter of his authority, nothing could nearer resemble it, for the secretary of a real estate investment company, having full charge of its affairs, receiving all moneys, preparing all papers and the like, received a certain sum for investment in real estate, with the approval and acquiescence of the president thereof. Certainly, the act of receiving the money of the plaintiff by Carr as the secretary of the company was not an act extrinsic to his usual employment or his duties; and it was also one in harmony with the duties of a principal officer and the practical general manager of an investment company. I think that the defendant is estopped (N. Y. & New Haven R. R. Co. v. Schuyler, 34 N. Y. 30, 59, 60; Hannon v. Siegel-Cooper Co., 167 N. Y. 244, 60 N. E. 597, 52 L. R. A. 429), and of the two the plaintiff must be regarded as the innocent person who shall not suffer (Walsh v. Hartford Fire Insurance Co., 73 N. Y. 5). The able and learned counsel for the appellant in his printed points frankly admits that there might be ordinarily some force in the suggestion that innocent third parties might have been misled, but asserts that there is none in this case, because it appeared that the plaintiff had employed Carr as a lawyer, and that he had carried on considerable law business for her. The plaintiff testifies that she had had some trouble with reference to some abuse of her granddaughter, and that in 1901, after her acquaintance

with Carr, she asked his advice, but never employed him as a lawyer, and that at her instance Carr had guardianship papers prepared, and advised her relative to the will of an ancestor. I cannot see that the principle invoked is at all affected by the fact that the plaintiff, after she had become acquainted with Carr as the secretary of the defendant at its office, consulted him with reference to either of such matters. The defendant also insists that the plaintiff dealt personally with Carr, and not in his official capacity. Under the sign of the corporation and the blazing of Carr's secretaryship therein there also appeared in small letters Carr's name as "Conveyancer and Examiner of Titles." It is testified that Carr was permitted to carry on a private business in the company's office. These facts alone, merely coupled with the failure of proof that the company ever received the money from Carr, or with the proof that it did not receive it from him, are not sufficient to disturb the findings of the learned county court. The failure of Carr to turn over the moneys establishes nothing more than his theft thereof. And there is no question but that he was, generally speaking, a thief. The facts that the plaintiff received interest from Carr by his personal check, or signed receipts running to Bender, are not sufficient to establish that her transactions were not presumed by her to be with or through the defendant, or that she was not justified in presuming that the money had been paid to the company; and received by it for investment. Moreover, the plaintiff testifies that on one occasion, when she called at the office for interest, Martin, the president of the defendant, handed Carr her interest money on the $1,500 mortgage and on the $2,500 mortgage as well. The defendant, having received the money, cannot be heard to plead, as against the plaintiff, that such investment as the payment to it contemplated was ultra vires. Pratt v. Short, 79 N. Y. 437, 35 Am. Rep. 531; Rome Savings Bank v. Krug, 102 N. Y. 331, 6 N. E. 682. Nor should the plea that, as the plaintiff was told that the property belonged to Bender, and that, as she accepted the bond and mortgage directly, thereby she acquiesced in and discharged the company, prevail on the theory that she ratified such act and discharged the company in favor of Bender; for, having accepted the money, the defendant was bound either to return it to her or to invest it for her. It is liable for the fraud or wrongdoing or negligence of its agents or servants. Cragie v. Hadley, 99 N. Y. 131, 1 N. E. 537, 52 Am. Rep. 9; F. A. Bank v. F. S. & G. S. F. R. R. Co., 137 N. Y. 231, 33 N. E. 378, 19 L. R. A. 331, 33 Am. St. Rep. 712; N. Y. & New Haven R. R. Co. v. Schuyler, supra. She had a right to rely upon a fair and due performance of the obligation assumed by the defendant when it accepted her money, and it cannot acquit itself merely by showing that she accepted from its officers a forged mortgage. Moreover, the plaintiff also testifies that she was told by Carr, in the presence of Martin, that the company owned these lots, and that they had sold them to Bender, who was giving a mortgage back. This was virtually an assurance that the company, about to take a mortgage on account of its sale to Bender, instead transferred it to the plaintiff in exchange for her payment to it of $1,500.

The judgment should be affirmed, with costs. All concur.