(120 App. Div. 119)

AMERICAN EXCH. NAT. BANK v. WOODLAWN CEMETERY.

(Supreme Court, Appellate Division, First Department.   June 14, 1907.)

1. CEMETERIES—INCORPORATION—ISSUANCE OF SHARES.

Laws 1847, p. 128, c. 133, § 7, providing for the incorporation of cemetery associations, authorized the appropriation of one-half of the proceeds of lot sales to the payment of the purchase price of the lands, and the use of the residue for improvements. Laws 1853, p. 200, c. 122, § 1, authorized an agreement with the landowners for the payment of one-half of the proceeds from the sale of lots. Laws 1860, pp. 259, 260, c. 163, §§ 1, 2, 3, and Laws 1879, pp. 155, 156, c. 107, §§ 1, 2, 3, authorized the issuance of certificates declared to be personal property to the landowners representing their interest in the association. *Held*, that certificates so issued, containing blank powers of attorney, transferrable by delivery, possessed on the books of the association the same attributes with reference to transfers as certificates of corporate stock.

2. SAME—OVERISSUE—FRAUD OF OFFICER—LIABILITY OF ASSOCIATION—INNOCENT PURCHASER.

A cemetery association, authorized to issue shares for land purchased for use of the cemetery, issued stock to the full limit of its authority transferrable on the books of the company. K., one of the original incorporators, and one of the owners of land conveyed to the association, received certificates representing his share, and became defendant's comptroller or chief executive officer. K. and the president of defendant association signed certain blank certificates intended for use in case of transfers after which K. filled in the blanks on three certificates for 100 shares, each to himself, without the surrender of any other certificates, and pledged the same to plaintiff for a loan. This loan was shortly thereafter paid, and seven years thereafter K. again applied to plaintiff for a loan on the certificates, which was granted. *Held*, that defendant, having permitted such certificates to remain outstanding for more than seven years, without examining K.'s books or taking any steps to discover the fraud, was liable to plaintiff in damages to the extent of the amount loaned and interest.

3. SAME—NOTICE.

The fact that the certificates pledged were not consecutively numbered, and that certain of plaintiff's employés had knowledge of the appointment of a transfer agent to register transfers of such stock, was insufficient to charge plaintiff with notice of the spurious character of the certificates; plaintiff being under no obligation as a matter of law to have the certificates registered.

Scott, J., dissenting.

Appeal from a Judgment on Report of Referee.

Action by The American Exchange National Bank against The Woodlawn Cemetery. From a judgment in favor of plaintiff for $47,890.74 pursuant to a referee's report, defendant appeals.   Affirmed.

Argued before PATTERSON, P. J., and INGRAHAM, LAUGHLIN, and SCOTT, JJ.

George A. Strong (William S. Opdyke, on the brief), for appellant.
Benjamin N. Cardozo (Edgar J. Nathan, on the brief), for respondent.

LAUGHLIN, J.   Plaintiff obtained, and held as collateral to the indebtedness of one Caleb B. Knevals to it, three certificates of shares purporting to have been issued by the defendant, which had been

fraudulently diverted by Knevals while he was its vice president and "comptroller or chief executive officer." This action was brought upon the theory that the certificates were void, on the ground that they constituted an unauthorized overissue of shares, but that plaintiff, as an innocent holder, is entitled to recover the damages it has sustained on the ground that they were caused by the wrongful acts of the officers or agents of the defendant, and that, as against such cause of action, the defendant is estopped from asserting that the certificates were issued without authority or wrongfully diverted, notwithstanding the fact that they are void and unenforceable as certificates because they are in excess of the authorized issue.

The material facts are not controverted. The plaintiff is a national bank. The defendant is a domestic cemetery corporation, organized and existing under the provisions of chapter 133, p. 125, of the Laws of 1847, entitled "An act authorizing the, incorporation of rural cemetery associations," and the acts amendatory thereof and supplementary thereto. On the 31st day of May, 1864, shortly after its incorporation, the defendant purchased and obtained conveyances of certain lands situate in the county of Westchester, comprising a tract of 307.51 acres, for cemetery purposes, upon agreement to pay therefor to the owners, who numbered 17, one-half of the proceeds of all sales of lands or plots, quarter annually, and that the right to such proceeds should be represented by 12,500 equal shares, to be distributed among the owners according to their respective interests which were therein specified. The defendant thereafter prepared for execution and delivery to the owners, in fulfillment of the agreement, certificates certifying that the holder was entitled to a specified number, according to their respective proportions, of "shares in the Woodlawn Cemetery transferrable only·on the books of the company on surrender thereof," and caused the same to be delivered to the persons entitled thereto. The agreement under which the lands were purchased provided that one or more certificates should be issued to each owner for his shares, "and said shares shall be personal property, and may be transferrable by the said persons or their legal representatives, on the books of the part of the first part, the same as stock is usually· transferrable"; and further provided as follows:

"This agreement shall be binding upon the parties hereto, and upon the successors of the party of the first part [Woodlawn Cemetery], and the executors, administrators and assigns of the parties of the second part [the owners], and upon all persons hereafter holding any of the said shares, whether parties hereto or not."

Said Caleb B. Knevals was one of the original incorporators of the defendant, and one of the owners of the lands conveyed to it, and as such owner was entitled to and received certificates for shares representing his proportionate interest. On the 26th day of May, 1869, he was elected vice president of the defendant, and on the 13th day of September, 1871, he was appointed "comptroller or chief executive officer," and he continued to hold said office and position and had general charge of the affairs of the defendant until August 2, 1899. In the year 1893, William A. Booth was president and Charles P. Knevals was assistant treasurer of the defendant, and they were au-

thorized to sign and issue new certificates in place of certificates surrendered for cancellation. They signed a certificate, dated April 3, 1893, being No. 624, and another, dated April 8, 1893, being No. 606, and a third, dated July 19, 1893, being No. 612, in blank as to the number of shares and in blank as to the owner, and left the same with said Caleb B. Knevals to be filled out as to the number of shares and owner, and to be delivered to the person entitled thereto on the surrender of certificates for transfer and cancellation. Shortly thereafter, and during the same year, said Caleb B. Knevals, without authority, and without the surrender of any certificate for transfer or cancellation, and without transfer to him on the books of the company, or otherwise, of any outstanding certificate, wrote his own name in these certificates as the owner, and he likewise filled in the number of shares, as follows: One hundred each in certificates No. 624 and 606 and 24 in certificate No. 612. By these fraudulent acts of Knevals the total number of shares of the defendant was increased from 12,500 to 12,724. With the exception of the dates and number of shares, these certificates were all in the same form and were like the genuine certificates issued by the defendant. It will suffice, therefore, to set forth one of these certificates. Certificate No. 624 was as follows:

"Whole Number of Shares, 12,500.
"No. 624.  100 shares.
"The Woodlawn Cemetery.
"Organized December 29, 1863.

"This certifies that Caleb B. Knevals is entitled to one hundred shares in the Woodlawn Cemetery, transferrable only on the books of the cemetery association, upon the surrender of this certificate.

"In testimony whereof the Woodlawn Cemetery have caused this certificate to be signed by their president and countersigned by their treasurer, in the city of New York, this 3d day of April, 1893.

"Wm. A. Booth, President.

"Countersigned:
        "Chas. P. Knevals, Asst. Treasurer."

He attached to each certificate a sheet of paper—being the printed form of power of attorney provided by defendant for use in connection with genuine certificates—on which he had written, in a printed blank power of attorney, the number of shares to correspond with the certificates, and had executed the power of attorney in blank. The date of the execution of the power of attorney attached to certificate No. 624 was the same as the date of the certificate, but the power of attorney relating to certificate No. 606 purports to have been executed on the 10th of April, 1895. As no point is made of this, it is probable that there is a clerical error in the printed record, and that the year is 1893. That relating to certificate No. 612 purports to have been executed on the 26th of October, 1893.

During the same year that these certificates were issued, or shortly thereafter, said Caleb B. Knevals pledged them to the plaintiff as security for a loan, and he subsequently redeemed them. The officers of the plaintiff were familiar with the signatures of the officers of the defendant, who signed the certificates, and knew that they were genuine. Genuine certificates in the defendant appear to have been

pledged, bought, and sold as if they were certificates of stock in a business corporation. They were very valuable and had a market value which was somewhat irregular. The plaintiff frequently loaned money upon their security; and, although its officers were not actually familiar with the agreement or provisions of the statute under which the certificates were issued, they knew that the defendant was a cemetery corporation, and that it, from time to time, and at regular intervals, credited the shares with dividends or moneys which made them valuable; and it· understood from information derived from the president of the defendant that they were probably worth $200 per share. On or about the 20th day of November, 1900, said Knevals again applied to plaintiff for a loan of $36,000 on these spurious certificates. The application was granted forthwith, the loan to be payable on demand (it being understood that it would be repaid within a short time, as Knevals expressed the intention of selling some of the shares), with interest at the rate of 5 per centum; and on the day following Knevals appeared at the bank with a messenger of the Trust Company of New York, who produced the certificates. The president of the plaintiff examined and recognized them as those upon which the bank had previously made a loan to Knevals, and accepted them. Plaintiff delivered a check for the amount of the loan, to the order of Knevals, who thereupon indorsed it in blank and delivered it to the messenger of the trust company, which collected the same. Interest was paid on this loan May 1, 1901, but the entire principal and interest since that date remain unpaid. The president of the bank knew said Caleb B. Knevals' handwriting, but did not notice at the time that the blanks had been filled in by him. The trial court found that the plaintiff took the certificates in good faith and without notice or knowledge of the facts upon which their invalidity depends. The bank held no other security for the indebtedness, and said Knevals died leaving a bankrupt estate.

The issue of these spurious certificates to Knevals was entered on the books of the defendant at the time he filled in the blanks; and an examination of the certificate book of shares of the defendant, at any time thereafter, would have revealed the fact that they had been issued without the surrender of any outstanding certificate, and that there had been an unauthorized overissue of shares. The plaintiff did not own any shares in defendant, and neither was familiar with the contents of its records, nor had access thereto. It does not appear that the other officers or shareholders of the defendant exercised any supervision over said Caleb B. Knevals, or examined the books, or discovered this overissue of shares, or took any steps to have the certificate canceled or to warn or protect those dealing in such shares against these spurious certificates, although they had been issued and outstanding about seven years before the plaintiff accepted the same the last time as security for this loan. The latter part of November, 1901, interest not having been paid on the loan since May 1st that year, the defendant, with a view to having the stock transferred to its name and obtaining any dividends apportioned to the shares, presented the certificates to the Fourth National Bank, which was defendant's agent for the transfer and registration of certificates, and requested that the

certificates be transferred to its name. The request was refused, upon the ground that the certificates constituted "an overissue of the shares of the cemetery." Plaintiff thereupon offered to surrender the certificates to the defendant without transfer or requiring the issue of new certificates upon payment of the amount it had loaned thereon, with interest; which offer was declined upon the same ground. A like offer was renewed on the trial and was declined. At the time of such refusal by the defendant, the market value in the city of New York of genuine shares in defendant was $160 per share, and their market value had equaled that sum at all times since plaintiff last accepted the certificates in pledge.

The issuance of the certificates to landowners in payment for the land was fairly contemplated and authorized. The statute under which defendant was incorporated required cemetery associations to appropriate and apply one-half, at least, of the proceeds from the sales of the lots to the payment of the purchase price of the lands, and to use the residue in improving the cemetery grounds (section 7, c. 133, p. 128, Laws 1847), and authorized the cemetery association to agree with the owners from whom land should be purchased to pay therefor one-half of the proceeds from the sales of cemetery lots (section 1, c. 122, p. 200, Laws 1853). It was manifest that the period during which such an agreement would continue would be quite indefinite, and that it would likely be very long. Evidently, it was impracticable to give back a purchase-money mortgage, conditioned for the payment to the owners of one-half the proceeds of the sale of lots, with a provision for releasing lots, from time to time as they were sold, from the lien of the mortgage. That would have necessitated obtaining a release from each mortgagee upon every sale of a burial lot. There being many owners, such course would be inconvenient and expensive, and it was inevitable that in time it might be difficult to obtain releases from all of the mortgagees promptly, and that the number of those interested in the mortgage would increase by succession or devolution of interest, and that the rights of infants, who could not release without application to the court, at least would soon become involved. The practical scheme was, therefore, to declare, by mutual agreement of all parties in interest, that the claims of the owners against the cemetery association should be deemed personal property, and should be represented by shares according to their respective interests, substantially in the form of capital stock, as was done. The certificates thus issued as evidence of the claims or shares of the respective owners, although not expressly authorized by statute, were quite similar, so far as the legal questions here presented are concerned, to certificates at that time authorized to be issued by such cemetery associations, to refund existing lawful indebtedness, including their indebtedness for lands purchased for cemetery purposes, which certificates were declared to be personal property, and it was evidently contemplated that they should be freely circulated, for it was expressly provided by statute that they should be transferrable by delivery (sections 1, 2, 3, c. 163, pp. 259, 260, Laws 1860), and in exchange therefor the Legislature subsequently au-

thorized the issue of certificates of stock (sections 1, 2, 3, c. 107, pp. 155, 156, Laws 1879).

The Legislature having left it to the parties to prescribe the form of the agreement and how the interests of the landowners should be evidenced, I am of opinion that, in view of the facts pointed out, it cannot be said that the issuance of the certificates to represent the interests of the landowners was not authorized. The plaintiff was doubtless chargeable with knowledge of the statutory powers and duties of the defendant. Assuming that it was also chargeable constructively with knowledge of the scheme devised for issuing certificates of shares and facilitating the transfer thereof, still it had no means of knowing from time to time who were the owners of shares, excepting as represented by the defendant by the issuance of certificates. The defendant evidently deemed it advantageous to issue these certificates in form to enable the owners to readily transfer them, and it is probable that it was contemplated that they would be bought and sold upon the market, and pledged as security for loans, as was subsequently done. It may be that the plaintiffs could have discovered from the public records who were entitled to certificates originally; but it is manifest that any one accepting one of these certificates in pledge or taking title thereto was obliged to rely on the fact that the certificate had been issued by the defendant and was outstanding. The issuance of a certificate by the defendant, after the original certificates had all been issued, was in effect a distinct representation and assurance to any one taking the same in pledge, or taking title thereto, that it had been duly issued in place of a certificate for a like number of shares which had been duly surrendered and canceled, so that the total authorized issue of shares was not increased thereby. Holbrook v. New Jersey Zinc Co., 57 N. Y. 616. This was the scheme devised by the defendant, and the execution of which it intrusted to its officers.

The certificates in question were prepared by the defendant and placed in the hands of its officers authorized to issue them in place of any certificates that might be surrendered for cancellation. They were signed by the duly authorized officers of the defendant, and were identical in form with those duly issued. They were then placed in the hands of Knevals, the comptroller and chief executive officer of the defendant, with authority to fill them out and to issue them. These certificates were something more than mere promises to pay money, which might be subject to all equitable defenses. They are, not strictly speaking, nor are ordinary certificates of stock, negotiable instruments (Knox v. Eden Musee Co., 148 N. Y. 441–454, 42 N. E. 988, 31 L. R. A. 779, 51 Am. St. Rep. 700) ; but since defendant intended that they should be transferrable by delivery like certificates of stock, with power of attorney for execution in blank or giving the name of the transferee, they properly fall within the rule applicable to certificates of stock, giving them some of the features of negotiability, rather than that applicable to strictly nonnegotiable securities, which even in the hands of innocent purchasers for value are subject to all equitable defenses existing between the original parties. Rapps et al. v. Gottlieb et al., 142 N. Y. 164, 36 S. W. 1052; Zander v. N. Y. Security & Trust Co., 178 N. Y. 208, 70 N. E. 449, 102 Am. St.

Rep. 492. They represented an equitable interest of the vendors in the land, and the defendant intended that they should be available for negotiation, and in issuing them it knew that it was representing to third parties who might purchase the same or advance money thereof that the person to whom they were issued had an interest in the proceeds of the sales of the lots represented by the part of the shares specified in the certificate. There was no agreement to pay absolutely or any particular sum or at a fixed time. The agreement to pay was from the proceeds of sales of burial lots. On dissolution of the corporation there can be no doubt that the holders would have had an interest in the proceeds of sale under judicial process. It has been held that they have an interest in the award made in condemnation proceedings, where part of the cemetery lands are lawfully taken for public purposes. Whittemore v. Woodlawn Cemetery, 71 App. Div. 257, 75 N. Y. Supp. 847. The defendant had no authority to issue certificates in excess of the issue authorized, and consequently these three certificates are not enforceable as such.

It is argued that, since the defendant was without authority to issue certificates in excess of the authorized issue, it cannot be held liable, even though it assumed to authorize their issuance, or even though its officer, to whom it delivered the certificates with authority to issue them, thereby leaving it to him to determine when their issuance would be warranted, exceeded his authority and diverted them to his own use. It is quite clear, of course, that if the defendant would not be liable had it issued these certificates to Knevals, with the understanding that he was to appropriate them to his own use, it cannot be liable for his wrongful act in diverting them. It does not follow, however, that the defendant is relieved from liability by the mere fact that the certificates were in excess of the lawful issue. The defendant may not have had authority to issue the certificates, but it had power to injure innocent third parties, and it may be liable to them in damages, even though not liable on the certificates as such. Vought v. Building & Loan Association, 172 N. Y. 517, 518, 65 N. E. 496. The certificates are similar, so far as the question here presented is concerned, to stock certificates, the issuance of which is a continuing representation that the party to whom issued was rightfully entitled thereto, and the defendant, having vested its agents with authority which might be and was abused to the prejudice of third parties, who were not aware of the limitation upon his authority to put the certificates in circulation, took the risk and must bear the loss resulting from the wrongful diversion of the certificates. New York & New Haven R. R. Co. v. Schuyler, 34 N. Y. 30; McNeil v. Tenth National Bank, 46 N. Y. 325, 7 Am. Rep. 341; Holbrook v. N. Y. & New Jersey Zinc Co., 57 N. Y. 616; Bruff v. Mali, 36 N. Y. 200; F. A. Bank v. F. R. S. & G. S. I. R. R. Co., 137 N. Y. 231, 33 N. E. 378, 19 L. R. A. 331, 33 Am. St. Rep. 712; G. N. Bank v. State, 141 N. Y. 379, 36 N. E. 316; Bank of Batavia v. N. Y., L. M. & W. R. R. Co., 106 N. Y. 195, 12 N. E. 433, 60 Am. Rep. 440; Hanover Natl. Bank v. Am. Dock & Trust Co., 148 N. Y. 612, 43 N. E. 72, 51 Am. St. Rep. 721; Fifth Ave. Bank v. Forty-Second St. R. R. Co., 137 N. Y. 231,

33 N. E. 378, 19 L. R. A. 331, 33 Am. St. Rep. 712; Matter of Jones, 172 N. Y. 575, 65 N. E. 570, 60 L. R. A. 476.

Moreover, it appears that the defendant trusted implicitly in Knevals, and during a period of many years it either failed to supervise or inspect the records showing the cancellation of old and the issuance of new certificates which had been issued in blank and intrusted to him for delivery, or, having discovered the wrongful diversion, it took no steps to have the certificates surrendered and canceled, or to notify those whom it knew to be or had reason to believe were dealing in the securities. It was not shown when defendant discovered that Knevals wrongfully diverted the certificates; but evidence tending to show that it was before plaintiff made the last loan on them was excluded on objection of counsel for the defendant. It appears, however, that the defendant's records at all times, from the issuance of these certificates until the plaintiff made the second loan thereon, nearly seven years thereafter, showed that they were issued without the surrender of other certificates for cancellation and constituted an overissue. The facts, therefore, bring the case clearly within the principle of the Schuyler fraud cases, so called, and kindred authorities, where it is held that a corporation is liable on principles of agency and estoppel, to innocent purchasers or pledgees, for the damages sustained through the wrongful acts of its officers in the discharge of duties intrusted to them, where they were authorized to act, and, instead of acting for the interests of the company and within their authority, departed from their instructions and acted for themselves, and for its negligence in failing to discover such wrongful acts within a reasonable time and take steps to prevent imposition on third parties. New York & New Haven R. Co. v. Schuyler, supra; Vought v. Building & Loan Ass'n, supra; Trustees, etc., v. Smith, 118 N. Y. 641, 23 N. E. 1002, 7 L. R. A. 755.

If this had been merely a fraudulent issue, and not an overissue of certificates, to a party not entitled thereto, made by an officer or agent authorized to issue certificates to a party entitled thereto, and the third party had taken the same by purchase or in pledge innocently and without negligence, the defendant would have been obliged, upon principles of estoppel, to recognize them as valid and issue genuine stock therefor, or admit the purchaser or pledgee to all the rights of certificate holders. 2 Thompson on Corporations, §§ 1493, 1494; 1 Cook on Stockholders, §§ 292, 293; Jarvis v. Manhattan Beach Co., 53 Hun, 362, 6 N. Y. Supp. 703; s. c. 75 Hun, 100, 26 N. Y. Supp. 1061, affirmed 148 N. Y. 652, 43 N. E. 68, 31 L. R. A. 776, 51 Am. St. Rep. 727. There is no difference in principle between liability for a fraudulent underissue and a fraudulent overissue by officers authorized to issue certificates, for the rule is based on the doctrine of respondeat superior. Nowack v. Metropolitan St. Ry. Co., 166 N. Y. 440, 60 N. E. 32, 54 L. R. A. 592, 82 Am. St. Rep. 691; Ring v. Long Island Real Estate Exchange, 93 App. Div. 442–447, 87 N. Y. Supp. 682; Miners, etc., v. Bank of Ardsley Hall Co., 113 App. Div. 202, 203, 99 N. Y. Supp. 98. Ultra vires would be no defense to this action for damages, if the certificates had been issued by the corporation itself; nor is it a defense where they were

issued by its agents having authority to issue them, although not to issue them to Knevals, for, in so far as the public are concerned, reliance must be placed on the issuance as a representation that the essential facts which would authorize their issue existed. Allen v. South Boston R., 150 Mass. 204, 22 N. E. 917, 5 L. R. A. 716, 15 Am. St. Rep. 185; Jarvis v. Manhattan Beach Co., supra. In addition to the cases already cited as sustaining the doctrine that the issuance of the certificates was a representation to the public that the party in whose name they were issued was the true owner, the decisions that repesentations made to a rating commercial agency by a merchant with respect to his property may be relied upon by third parties are in point. Eaton v. Avery, 83 N. Y. 31, 38 Am. Rep. 389; Tindle v. Birkett, 171 N. Y. 520, 64 N. E. 210, 89 Am. St. Rep. 822.

It is claimed that the plaintiff was negligent in not discovering that the certificates were not consecutively numbered; but it was shown that it was not unusual or a circumstance of suspicion to see a certificate of stock in circulation of an earlier date, of a lower number, than another. There is no force in the suggestion that as matter of law the plaintiff should have discovered and have had its suspicions aroused by the fact that the name of the owner of the certificates was filled in by Knevals. Titus v. Pres., etc., 61 N. Y. 237; Clinton Nat. Bank v. Nat. Park Bank, 37 App. Div. 601, 56 N. Y. Supp. 244, affirmed 165 N. Y. 629, 59 N. E. 1120; Isham v. Post, 141 N. Y. 100, 35 N. E. 1084, 23 L. R. A. 90, 38 Am. St. Rep. 766. The evidence is that this was not noticed at the time, and that, if it had been, it would not have attracted especial attention, in view of the genuineness of the signatures, for the reason that blanks in certificates are often filled in by interested parties.

It is also contended that the plaintiff should have surrendered the certificates and have had the stock transferred to its name on the books of the company; but, in taking certificates of stock in pledge, that does not appear to have been customary, unless requested by the customer.

Finally, it is claimed that the bank was negligent in not having the stock registered. It appears that on or about the 14th day of October, 1899, shortly before this loan was made, the defendant duly designated the Fourth National Bank registrar and transfer agent of certificates. The president of the plaintiff testified that the registration of stock is "an additional verification of the genuineness of the certificates; that is the very purpose and object of registration." A question of fact was presented as to whether the president or cashier of the acting loan clerk in this transaction, which was conducted by him and the president, had notice that transfers could be registered, and the court has found in favor of the plaintiff on that issue. It appears that plaintiff's loan clerk, who, however, was absent at the time of this transaction, and perhaps another employé of the plaintiff, were aware that the Fourth National Bank had been appointed transfer agent and registrar by the defendant. They acquired this knowledge in acting for customers of the bank and without the authority or direction of its officers, and it is not clear that the bank would be chargeable in this transaction with the knowledge thus acquired by

them; but, however that may be, the plaintiff was not obliged as matter of law to have these certificates registered. The trial court was justified in finding that the plaintiff, knowing the genuineness of the signatures to these certificates, and having made a loan to Knevals thereon many years before, had no reason to suspect his title, and was not guilty of negligence in not having them registered.

It follows that the judgment should be affirmed, with costs.

PATTERSON, P. J., concurs.

INGRAHAM, J. (concurring). I concur with Mr. Justice LAUGHLIN. While it is clear that this instrument was not in any sense a negotiable instrument, it was a certificate issued by the corporation, or its authorized officers, which certified to the existence of a fact upon which the plaintiff relied, and under these circumstances the defendant is estopped from denying the existence of that fact. It seems to me that the case is directly within the principle established in Jarvis v. Manhattan Beach Co., 148 N. Y. 652, 43 N. E. 68, 31 L. R. A. 776, 51 Am. St. Rep. 727, and the cases there cited, and that, being estopped from denying the fact upon the faith of which plaintiff advanced its money, the defendant was liable.

SCOTT, J. (dissenting). While I freely concede that the question involved in this appeal is a close one, and the considerations advanced by Mr. Justice LAUGHLIN for an affirmance of the judgment are very persuasive, I cannot avoid a feeling that to affirm it is to give effect rather to the form than to the real nature of the certificates issued by the defendant. Irrespective of the form in which the certificates were drawn, they were not certificates of stock, but merely promises to pay in the future. The defendant had no capital stock, and could have none, and if, in issuing certificates in the form which it adopted, it had attempted to create capital stock, or to issue certificates representing capital stock, it would have undertaken to do that which it had no legal capacity to do. The plaintiff cannot, and does not, as I understand, base any claim to a recovery upon the proposition that it was misled by the form of the certificate into believing that the defendant was a stock corporation, and that the certificates represented actual stock. The defendant's incapacity to issue stock, and its obligations to pay to the persons from whom it had purchased lands one-half of the receipts from sales of lots as received, were matters of record incorporated into the statute of the state, and in dealing with apparent obligations issued by defendant the plaintiff was chargeable with notice and knowledge of the statutory limitations and extent of defendant's powers. The certificates were nothing more than promises to pay in the future, and in this respect are similar in legal effect, though not in form, to the certificate of deposit involved in Zander v. N. Y. Security & Trust Co., 178 N. Y. 208, 70 N. E. 449, 102 Am. St. Rep. 492, to which the Court of Appeals denied the attribute of negotiability. There appears to me to be a well-marked distinction between the case now under consideration and those relied upon by the learned referee below and by Mr. Justice LAUGHLIN, of which N.

Y., N. H. & H. R. R. Co. v. Schuyler, 34 N. Y. 30, is a leading and typical case. That distinction I find in the fact that the false instruments in all these cases purported to be certificates such as the companies had the power and authority to issue, and, if genuine, were negotiable. Hence the principle of implied agency was held to be applicable. The Court of Appeals has, however, expressly refused to extend the doctrine of these cases where the agent has undertaken to do an act not within the scope of either his actual or apparent authority. Man. Life Ins. Co. v. Forty-Second St., etc., R. R. Co., 139 N. Y. 146, 34 N. E. 776; Knox v. Eden Musee Co., 148 N. Y. 441, 42 N. E. 988, 31 L. R. A. 779, 51 Am. St. Rep. 500. If the certificate in the present form is to be regarded, with reference to its form, as a certificate of stock, it was a certificate of a character which the defendant had no power to issue, and which, consequently, its officers had no actual or apparent authority to issue. If, on the other hand, it is to be regarded in its true light, as a promise to pay in the future, it possesses neither inherently nor in form any of the attributes of negotiability, for it bears upon its face the qualifying words "transferrable only upon the books of the cemetery association upon the surrender of this certificate," which correspond to the words which in the Zander Case were held to impress upon the certificate of deposit the quality of nonnegotiability. If the plaintiff relies upon some supposed negligence in issuing the certificate to Knevals, the statute of limitations constitutes an effectual answer, because the negligence, if there be any of which plaintiff can complain, happened when the certificates were given to Knevals.

In my opinion, the judgment should be reversed, with costs, and the complaint dismissed.