SHERWOOD MEMORIAL GARDENS, INC. (TENNESSEE), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 793–62. Filed April 17, 1964.

*Robert E. Johnson*, for the petitioner.

*Howard K. Schwartz*, for the respondent.

DAWSON, *Judge:* Respondent determined deficiencies in petitioner's income tax for the taxable years and in the amounts set forth below:

| Taxable year ending September 30: | Deficiency |
| --- | --- |
| 1957 | $2, 906. 36 |
| 1958 | 31, 627. 52 |
| 1959 | 17, 488. 83 |

The issues presented for decision are: (1) Whether so-called certificates of indebtedness issued by petitioner as an integral step in the formation and commencement of its business are in substance and reality evidences of equity investment placed at the risk of petitioner's new venture, thus rendering payments made in respect to such certificates an improper addition to petitioner's cost basis in the assets it acquired in exchange for their issuance; (2) whether petitioner is entitled to determine its development costs by (a) either excluding or deducting from its income 15 percent of the base sales price of burial lots sold or (b) by adding to the cost of such burial lots sold an allocable share of estimated development costs, or, whether respondent was correct in allowing petitioner only its actual development costs and, if so, whether such actual costs are to be allocated over petitioner's entire cemetery or on a per garden basis.

FINDINGS OF FACT

Some of the facts were stipulated by the parties. Their stipulation, together with attached exhibits, is incorporated herein by this reference.

Sherwood Memorial Gardens, Inc., hereinafter referred to as petitioner, is a Tennessee corporation, organized in 1955, with its principal office in Knoxville, Tenn. Its Federal income tax returns, made on the accrual basis for the fiscal years ending September 30, 1957, 1958, and 1959, were filed with the district director of internal revenue, Indianapolis, Ind.

Petitioner was originally organized on September 2, 1955, under the name Knollwood Memory Gardens, Inc., as a for-profit cemetery corporation. By its charter it was invested with the power to acquire and operate land to be used exclusively for a cemetery for the burial of the dead and to conduct activities necessary and incidental to the operation of such cemetery. Its present name was assumed on September 30, 1955, by charter amendment. Since the latter part of 1955 petitioner has been engaged in the business of operating a memorial-type cemetery, known as Sherwood Memorial Gardens, at Knoxville, Tenn., and a part of such business has included the sale to the public of burial rights in lots and plots located therein.

Fred W. Meyer, Jr., is petitioner's president, a member of its board of directors and owner of 998 of its 1,000 authorized shares of stock. He has been actively connected with the commercial cemetery business in the United States for some 17 years, and is well known in the cemetery trade. Among his various cemetery interests Meyer is president and principal stockholder of Jefferson Memorial Gardens, Inc., a corporation owning and operating a cemetery in Birmingham, Ala.

Sometime prior to July 18, 1955, Meyer was contacted by Abe Berkowitz, a Birmingham lawyer. Berkowitz was also connected with the cemetery business having earlier acquired an interest in several Florida cemeteries. Through his interest in these Florida cemeteries Berkowitz had learned of Meyer's activities at Jefferson Memorial Gardens in Birmingham and he arranged to meet Meyer. During the course of this meeting Meyer told Berkowitz of his intention to open a new cemetery in Tennessee, and the possibility of an investment by Berkowitz in such a venture was discussed. As a result of this discussion, the following letter was sent by Meyer to Berkowitz on July 18, 1955:

This letter is in response to your inquiries as to my contemplated cemetery project in Blount County, Tennessee. I have a written agreement under which twenty-one (21) acres of land, more or less, in Blount County, can be purchased for $25,000.00 cash. Eight (8) additional acres are available for purchase at

$9,250.00 and should be procured. I contemplate the development of a garden-type cemetery.

In addition to the aforesaid land cost, approximately $25,000.00 should be available for working capital. Of this amount about $15,000.00 normally would be used for physical development and improvement of the cemetery, and the remainder would be used for sales organization and administrative expenses.

It is my understanding that the population of Knox County, which would be served by this cemetery, is approximately 200,000. Based on past experience, I would estimate a gross business of approximately $1,000,000.00 during the first five years after completion of the development of the cemetery on the above basis. I would attempt no prediction as to volume of business thereafter.

If you are interested in participating in the financing of this project, I suggest either of the following methods.

## I.

(a) I will cause a new corporation to be formed under the laws of Tennessee, with authority to conduct only a cemetery business. I will furnish the minimum amount of capital required by the laws of Tennessee and will own all the capital stock, which will consist solely of common stock. This corporation will acquire and hold title to the aforesaid real estate and will conduct the business of developing the cemetery and selling burial spaces therein.

(b) You will furnish $59,250.00 in cash to the new corporation to be used by it for acquisition of land and for working capital as hereinabove outlined.

(c) The corporation will issue registered Certificates of Indebtedness, limited to 1,000 total units, representing an interest in 25% of proceeds from the base sale price of all lots or grave spaces sold in the cemetery during a period of fifteen years from the sale of the first such lot or space.

(d) Forty percent (40%) of the aforesaid Certificates of Indebtedness will be issued to you and sixty per cent (60%) thereof will be issued to me.

(e) I will execute and deliver to you my nonnegotiable note for $35,550.00, maturing five years after its date, without interest, which note shall be payable only out of proceeds received by me from sale of cemetery property, and in the event the cash proceeds from sale of such property payable to me and applied in reduction of said note shall not be sufficient to discharge the entire indebtedness evidenced thereby prior to the maturity of said note, I may, at my option, discharge the debt then existing by delivery to you of any and all interest that I may have in the aforesaid Certificates of Indebtedness which are to be issued to me. All income payable to me upon my 60% of the Certificates of Indebtedness will be applied upon said note until the same is fully paid.

(f) The term "base sales price" as used above with respect to the Certificates of Indebtedness means the gross sale price of the particular lot or grave space, less service charges, if any, and the amount required to be set aside for perpetual care. The corporation shall commence its application of proceeds of sales to the Certificates of Indebtedness in the month following the month in which the salesman making the respective sale has received full payment of his commission. The amount applicable to the Certificates of Indebtedness shall be computed proportionately on each monthly payment thereafter received upon the sale price until the respective contract is fully paid.

**II.**

(a) Same as paragraph (a) of method I.

(b) You will furnish $29,625.00 in cash to the new corporation and I will furnish the same amount, making a total of $59,250.00, to be used by the corporation for acquisition of land and for working capital as hereinabove outlined.

(c) Same as paragraph (c) of Method I.

(d) Twenty per cent (20%) of the aforesaid Certificates of Indebtedness will be issued to you and eighty per cent (80%) thereof will be issued to me.

(e) I will execute and deliver to you my nonnegotiable note for $17,775.00, maturing five years after its date, without interest, which note shall be payable only out of proceeds received by me from sale of cemetery property, and in the event the cash proceeds from sale of such property payable to me and applied in reduction of said note shall not be sufficient to discharge the entire indebtedness evidenced thereby prior to the maturity of said note, I may, at my option, discharge the debt then existing by delivery to you of any and all interest that I may have in the aforesaid Certificates of Indebtedness which are to be issued to me. Thirty-seven and one-half per cent (37½%) of all income payable to me upon my 80% of the Certificates of Indebtedness will be applied upon said note until the same is fully paid.

(f) Same as paragraph (f) of method I.

I will be glad to answer any questions that you may have with respect to these matters.

Subsequent to the above letter, negotiations were conducted between Berkowitz and Meyer and a fundamental agreement was reached between the two men relating to Berkowitz's investment in a future cemetery venture. It was determined that such investment would be along the lines described in part II of the July 18 letter. Berkowitz intended to raise the necessary funds by offering to a number of his associates in Birmingham the opportunity to participate in the venture. Accordingly, on September 7, 1955, he sent the following letter to such associates describing the proposed project and offering them the opportunity to invest in it:

BERKOWITZ, NEWFIELD, LEFKOVITS & PADEN,
718 TITLE GUARANTEE BUILDING,
*Birmingham 3, Alabama, September 7th, 1955.*

Mr. J. B. TORANTO, Mr. JULIUS ROUTMAN, I. EUBANKS, LEONARD LEWIS, SERGEI KAMPAKIS, JAMES L. PERMUTT, ALEX RITTENBAUM, AL BERKOWITZ.

DEAR ———: Mr. Lefkovits and I are leaving for Knoxville early Friday morning, to meet with Mr. Fred W. Meyer, of Indianapolis, Indiana, and his associates in the proposed Knoxville Park enterprise.

If we can work out with them the details of a proposed agreement, it is our intention to invest in the enterprise the sum of not less than $30,000 on behalf of our group. We acknowledge receipt of your own funds in the amount of $———.

The basis of the entire proposal, subject to the variations and changes we shall suggest, is set forth in the original letter sent to us July 18th by Mr. Meyer, a copy of which is enclosed for your interest and information.

In our opinion, there are certain tax advantages in the holding of such

certificates as we shall buy, provided the enterprise is successful, in that sums first received on account will properly apply to reduction of your base cost until your investment shall have been first fully recovered. The tax impact thereafter may be either at short or long term capital gains rate, dependent upon what we can work out.

I would not venture to predict what the result is going to be. However, it is obvious that, under the basic formula, neither you nor we will receive anything on account of the investment, except for a possible occasional cash sale in the interim, until collections on initial sales amount to fifty per cent of each such sale, which would be not less than a year hence, this in turn, dependent upon the amount of down payments, etc. In the interim, we will receive a weekly report of all sales and collections and a statement of the allocation and disbursement of funds received.

Generally speaking, individual spaces sell for approximately $100.00 each, which includes perpetual care, but spaces are usually sold in quantities known as "plots", consisting of from two to six spaces.

It is not impossible to lose money in a venture of this kind. In fact, I should imagine that it would not be extremely difficult. However, on the assumption that the promoters shall achieve sales comparable to those of their operation in Birmingham, the results could and would be profitable for all of us.

The price we are paying for our own certificates to be purchased will be the same price as you will pay. We will receive no cash commission or fee. We do, however, except to receive from Mr. Meyer and his associates the issue to us, out of the Class B certificates he and his group will hold and acquire, five per cent of the total certificates, in the event the cash investment is $30,000, and proportionately more if the investment shall be more. We do not, in any event, intend to contribute an investment in excess of $40,000 simply because we feel that the chances of success are enhanced by requiring substantial investment on the part of Mr. Meyer and his associates. This is agreeable to them. Our own investment will be the sum of $5,000.

From time to time, if the investment is made, we shall report to you with respect to such information as we receive in connection with sales and collections. Immediately following our return from Knoxville, if there is a deal, we shall report to you further as promptly as possible thereafter.

If there is anything about this you do not understand, please confer with either me or Mr. Lefkovits.

On September 2, 1955, petitioner was organized and incorporated under the laws of the State of Tennessee with an authorized common capital stock of 1,000 shares without par value, and a paid-in capital of $1,000.[1] All but two of its authorized shares were thereafter issued to Fred W. Meyer, Jr., who on September 28, 1955, was elected president of petitioner and named to its board.

Prior to October 4, 1955, Abe Berkowitz did not own any land in the State of Tennessee which would have been suitable for a cemetery. On October 4, 1955, he, together withe Jean Hope Meyer, the wife of Fred W. Meyer, Jr., purchased approximately 30 acres of land in Blount County, Tenn., from parties unrelated to these proceedings

---

[1] The minimum amount of capital necessary for incorporation under Tennessee law is $1,000. Tenn. Ann. Code, secs. 3714(5) (1932 Code) and 48–105(5) (1956 Code).

for a consideration of $30,000 (of which $15,000 was contributed by Berkowitz and his Birmingham associates and a like amount by Jean Hope Meyer).[2] Berkowitz did not select this land, nor at the time of the purchase did he even view it. The site, in fact, had been earlier selected by Fred W. Meyer, Jr., and certain of his associates. Moreover, although title to the 30-acre tract was nominally taken in the names of Berkowitz and Jean Hope Meyer, Berkowitz had not then, nor has he ever, met Jean Hope Meyer.[3]

By deed dated October 5, 1955,[4] Berkowitz and Jean Hope Meyer transferred the 30-acre tract, acquired by them on October 4, to petitioner pursuant to the following agreement (hereinafter referred to as the first agreement) :

### AGREEMENT

THIS AGREEMENT made and entered into this 4th day of October, 1955, by and between JEAN HOPE MEYER and A. BERKOWITZ, hereinafter designated as "First Parties", and SHERWOOD MEMORIAL GARDENS, INC., a corporation organized and existing under the laws of the State of Tennessee, with its principal place of business and domicile in the City of Knoxville, Tennessee, hereinafter designated as "Second Party,"

### WITNESSETH, THAT

WHEREAS, First Parties are the owners of certain real estate situated in Blount County, Tennessee, a description of which is attached hereto, made a part hereof, and marked Exhibit "A"; and

WHEREAS, Second Party desires to purchase all of the real estate described in Exhibit "A" for the purpose of dedicating and developing all of the same as a cemetery property to be known as Sherwood Memorial Gardens, and to manage, operate, develop and improve said cemetery and to sell lots therein, in accordance with the terms of this Agreement;

Now, THEREFORE, in consideration of the premises and the mutual covenants herein contained, it is agreed as follows :

1. First Parties shall sell said real estate described in Exhibit "A" to Second Party, all of which Second Party agrees to purchase.

2. Second party shall issue to First Parties, as payment and consideration for the aforesaid real estate, registered certificates of indebtedness, divided into one thousand (1,000) units, in such denominations as may be requested by the First Parties, and the said certificates shall be personal property and transferrable upon the books of the Second Party upon proper endorsement and surrender of said certificates. The said certificates shall provide that the Second Party will pay to the certificate holders, on account of the obligation thereof, a sum equal to twenty-five (25%) per cent of the base sales price of each and every burial space sold in said cemetery during a period of fifteen (15) years, in accordance with the following terms and conditions:

---

[2] This 30-acre tract is not the same tract described in Fred Meyer's letter of July 18, 1955. When it appeared that the land referred to in the July 18 letter was unobtainable, the present tract was selected.

[3] Negotiations leading up to the investment of Berkowitz and his associates in the contemplated cemetery venture were conducted mainly between Berkowitz and Fred W. Meyer, Jr., and Jean Hope Meyer had no part in these discussions.

[4] While the deed recites that it was made on Oct. 5, 1955, it was not executed by Jean Hope Meyer until Oct. 11, 1955, nor by Berkowitz until Oct. 17, 1955. It was not recorded until Oct. 21, 1955.

(a) The said fifteen (15) years shall commence with the date on which the first lot or grave space is sold and shall continue for fifteen (15) years thereafter;

(b) First Parties shall be entitled to receive payments made from all sales made during said fifteen (15) year period, even though collections and payments thereon are due and are made after the termination of said period;

(c) The "base sales price" on which said twenty-five (25%) per cent thereof due to first Parties shall be computed shall always, and in each instance, be the gross purchase price paid for the same by the individual lot or grave space purchaser, less the sum agreed to be deposited from each sale for perpetual care purposes, less the sum agreed to be held in and as a reserve on each sale, which reserve shall not exceed Five ($5.00) Dollars per grave space.

3. Each certificate shall be entitled to its pro rata share of the said twenty-five (25%) per cent, and shall be issued in the form and content of the copy of a certificate attached to this Agreement as Exhibit "B".

4. It is agreed that while the Second Party is to pay a total sum equal to twenty-five (25%) per cent of the base sales price of each burial space sold at the cemetery of the Second Party, as heretofore provided in paragraph 2(c), the said monies need not be remitted to the certificate holders from the first fifty (50%) per cent of the purchase price received by the Second Party on each burial space, but the entire twenty-five (25%) per cent must be remitted proportionately from each payment received by the Second Party from the purchases of burial space after fifty (50%) per cent of the total base sales price has been paid. Second Party shall have the option of remitting proportionately to certificate holders from any of the payments applicable to the first fifty (50%) per cent of the purchase price received by Second Party on each burial space, it being understood and agreed that Second Party is under no obligation to make any proportionate remittance from the first fifty (50%) per cent. On cash sales of burial spaces, the twenty-five (25%) per cent shall accrue to the First Parties, and shall be immediately due and payable.

5. It is agreed that each certificate, to the extent of its pro rata share, shall be a lien upon the last fifty (50%) per cent of the total base selling price paid to the Second Party on each burial space, to the extent that payment is due under paragraph 4, and a lien, as well, upon all unsold land in said cemetery.

6. Within a reasonable time after the execution of this Agreement, First Parties will transfer and convey to Second Party all real estate described in Exhibit "A" by good and sufficient statutory warranty deed, conveying good and merchantable title without encumbrances.

7. Second Party shall deposit in a separate account in the following identified bank located in Knoxville, Tennessee, to-wit: Hamilton National Bank, to be known as Sherwood Memorial Gardens Development and Improvement Account, and which shall constitute a fund to be used for the physical development and improvement of said cemetery during the life of this Agreement, the following sums:

Fifteen (15%) per cent of the gross purchase price of all sales for burial rights, whether for lots or graves, (excluding the amount to be set aside for the Perpetual Care Fund, and excluding the reserve of not to exceed Five ($5.00) Dollars per grave space). The sums specified herein are to be accumulated by taking out fifteen (15%) per cent of the money received from each sale in such a manner that at the time of delivery of the deed to such burial space, there shall have been fifteen (15%) percent of the gross sale deposited in such fund. The monies so accumulated shall be deposited with said Bank and shall be used for the express

purpose of the development and improvement of said cemetery and for no other purposes. (Nothing herein, however, shall limit or diminish the obligation of the Second Party to maintain and operate said cemetery as provided in paragraph 10 hereinbelow)

8. The amount to be paid into said Perpetual Care Fund shall be paid to the Trustee thereof, who shall not be an officer or director of the Second Party, by Second Party at the time that the interment rights are paid in full and a deed thereto is issued to the purchaser.

\*     \*     \*     \*     \*     \*     \*

9. Second Party shall keep books of accounts with proper entries made therein of all sales, purchases, receipts, collections, payments and transactions in reference to said cemetery, and said books of accounts shall be open for the inspection of said First Parties at all reasonable business hours. Second Party shall make weekly reports of sales and collections to First Parties.

10. Second Party further agrees:

(a) To construct and develop a cemetery consisting of sections or memorial gardens which are to be developed and divided generally into four (4) grave lots, or larger lots;

(b) In the event there are any special devices used in the promotion of sales such as package sales wherein burial vaults, grave markers, or other merchandise, are included with the sale of the lot at one stated price, then it is understood and agreed that the cost of any such devices, in a total amount not to exceed Twenty-five ($25.00) Dollars per burial space, shall be deposited in a special fund to cover the cost of installing such devices in accordance with the terms of the sale contracts;

(c) If any lots are sold on installment payments, the maximum period of payment shall not exceed forty-eight (48) months from the sale date. All interest and service charges added to installment contracts shall be retained by Second Party;

(d) All improvements made by Second Party shall immediately become a part of the realty and shall not be removed or destroyed.

(e) All bills and obligations incurred by Second Party in connection with said cemetery shall be paid within a reasonable time after the incurring thereof. Second Party will indemnify and save harmless First Parties from any and all claims or damages whatsoever arising out of the operations of this cemetery from and after the date hereof;

(f) To pay all of the costs of operating, selling and developing of said cemetery, of any nature whatsoever, incurred by it and to so conduct such operating, selling and developing in such a manner that no obligation or lien shall be created against said cemetery property, real or personal;

(g) To develop and make improvements in said cemetery commensurate with the sale of interment rights in said cemetery.

12. Neither the Second Party nor Fred W. Meyer, directly or indirectly, shall purchase, operate or develop any cemetery within a radius of twenty-five (25) miles of the land described herein without the written approval of the said First Parties, during the life of this contract.

13. Should Second Party decide to institute a program for the sale of mausoleum crypts in a mausoleum building or buildings erected, or to be erected, on the cemetery property or any other property within a radius of twenty-five (25) miles, which program might interfere with the sale of underground burial spaces, it will not institute such program without written consent of, and only upon terms and conditions satisfactory to First Parties.

14. In the event of default by Second Party (a) in the payment of any monies due to First Parties hereunder or (b) in the performance of any duties or

covenants of this contract assumed or agreed to be performed, which the Second Party shall fail to remedy within sixty (60) days after written notice thereof has been given by the First Parties to the Second Parties, then the First Parties shall have the right, at their option, to (a) declare this contract in default, notify the escrow agent of such default, and exercise the rights granted to the First Parties as provided in paragraph 15 of this agreement, (b) take any other action under this Agreement provided, afforded or allowed herein and (c) take any other action, whether under or apart from this Agreement, and avail themselves of any remedy to which they may be entitled, at law or in equity, under the laws of the State of Tennessee, and the right of the First Parties with respect to such action shall be cumulative.

15. Second Party will issue only one class of stock, that being common stock with full voting rights, and all of said common stock representing the voting rights and control of said corporation will be assigned in blank and will be deposited in escrow with First Bank & Trust Company, of South Bend, Indiana, as escrow agent, whereby the stock of said Second Party will be held by said escrow agent for the benefit of the First Parties until such time as the original investment of First Parties shall have been fully returned to them, in accordance with this Agreement. During the period of such escrow and until there shall be a default in the performance of one of the terms of this Agreement, the person in whose name such stock is held according to the records of Second Party shall be entitled to such rights as are pertinent to the ownership of common stock. In the case of default in the performance of any term or provision of this Agreement, and failure to correct the same within the time specified in paragraph 14 hereof, the escrow agent shall, upon written demand from First Parties, complete the transfer of said stock and deliver the same to First Parties who shall then have the right to take over the ownership and possession of said stock and exercise the control of Second Party. The record holders of the common stock of Second Party shall have the right to assign their interest in such stock, and such interest may pass by will or by the laws of descent, subject, however, to the rights and interests of the escrow agent and rights, security interest and lien of First Parties under the provisions of this Agreement.

16. Second Party shall furnish to First Parties a plat and list of lots in the cemetery and supplemental plats and lists from time to time as additional sections of the cemetery are developed. The prices of said lots, except as provided in paragraph 11 hereof, shall not be fixed at less than Seventy-five ($75.00) Dollars per grave space without the written consent of First Parties.

\*  \*  \*  \*  \*  \*  \*

20. During such time as the common stock of the Second Party shall remain in escrow as provided in paragraph 15, the Second Party agrees that it will not, without the consent of the First Parties, in writing, (a) cause any dividends to be declared or paid on said stock (b) alter or revise the capital structure of the corporation, (c) cause, authorize, or permit any executive or administrative salary to be paid to any executive or administrative officer or employee who is (directly or indirectly, through the holdings of any member of his family, or any partnership or corporation in which he has an interest) a stockholder or certificate holder of the Second Party, or (d) cause, authorize or permit any withdrawal of corporate funds except in the ordinary course of the operation of said cemetery and the performance of the obligation assumed under paragraph 10 of this Agreement, whether in the form of loans or otherwise, or (e) pledge, hypothecate, assign or transfer any of its accounts, receivables, contracts for the sale of burial space, or lots, during the 15 year term of the registered certificates of indebtedness.

In witness whereof, the parties have hereunto set their hands and seals on the day, month and year first above written in the City of Knoxville, State of Tennessee.[5]

During the month of October 1955, Berkowitz and Jean Hope Meyer furnished petitioner with $30,000 in cash, $15,000 coming from each. Ostensibly, these funds were to be used for the development and improvement of petitioner's 30-acre tract as a cemetery. However, petitioner did not reflect the receipt of the $30,000 into a development account on its books and records until September 30, 1956, approximately 1 year later.[6]

The plan of investment in the prospective cemetery venture chosen by Berkowitz and his Birmingham associates (hereinafter sometimes referred to collectively as the Birmingham group) was that outlined in part II of Fred Meyer's letter of July 18, 1955. Under that plan the Birmingham group supplied 50 percent of the funds initially needed for commencement of cemetery operations, in exchange for which they were to receive 20 percent of the 1,000 certificates of indebtedness to be thereafter issued by petitioner. The remaining 50 percent of the funds necessary to begin operations, although originally proposed to be advanced by Fred Meyer, was in fact supplied in the name of his wife, Jean Hope Meyer. In exchange for these funds, Jean Hope Meyer, like the Birmingham group, was to receive 20 percent of petitioner's certificates of indebtedness. Thus, the persons who supplied all of the capital necessary for commencement of petitioner's cemetery operations were to receive in exchange therefor only 40 percent of its certificates. The remaining 60 percent of such certificates were contemplated, in accordance with plan II of the July 18, 1955, letter, as being issued to persons who in effect made no *cash* outlay in payment for them.

Since 60 percent of the certificates to be issued were contemplated as going to persons who furnished no consideration therefor, it was agreed that the Birmingham group (represented by Berkowitz) would recover their initial investment before any distributions were made to those certificate holders who paid no cash consideration for their certificates. The following document purports to reflect this agreement:

---

[5] Although the first agreement contains the recitation that it was "made and entered into this 4th day of October, 1955," Berkowitz did not execute it until Oct. 17, 1955. The agreement was executed in behalf of petitioner and by Jean Hope Meyer sometime between Oct. 17 and Nov. 2, 1955.

[6] Subsequent to the transfer of the $30,000 to petitioner by Berkowitz and Jean Hope Meyer, the first agreement was changed to reflect the contribution. Among other changes, paragraph 1 was revised to read as follows:

"1. First Parties shall sell said real estate described in Exhibit "A" to Second Party and shall provide for the development and improvement of said real estate for use as a cemetery, up to the amount of Thirty Thousand Dollars ($30,000.00) as actually disbursed by Second Party, and Second Party shall purchase said real estate, with the aforesaid covenant for its development and improvements, for the consideration hereinafter stated."

## JOINT VENTURE AGREEMENT

THIS AGREEMENT made and entered into as of the 4th day of October, 1955, by and between JEAN HOPE MEYER, A. BERKOWITZ, UNIVERSAL ASSOCIATES, EDNA Z. BEINER and BERKOWITZ, NEWFIELD, LEFKOVITS & PADEN, hereinafter referred to as "joint Venturers";

### WITNESSETH THAT

WHEREAS, Jean Hope Meyer and A. Berkowitz have entered into an Agreement with Sherwood Memorial Gardens, Inc., a Tennessee corporation, pertaining to the establishment of a cemetery in Blount, County, Tennessee, pursuant to which said Sherwood Memorial Gardens, Inc., has agreed to pay to holders of registered certificates of indebtedness as issued by it. a sum equal to twenty-five per cent (25%) of the gross base selling price of each and every burial space sold in said cemetery as more particularly set forth in said agreement, which agreement is hereinafter referred to as the "Sherwood Memorial Gardens Agreement"; and

WHEREAS, certain of the joint Venturers propose to execute promissory notes payable to A. Berkowitz to evidence certain portions of their investment in this joint venture, which promissory notes shall be secured by an assignment of certain registered certificates of indebtedness owned by the makers of such notes; and

WHEREAS, the joint Venturers desire to indicate the manner in which their relative rights and interests shall be recognized;

Now, THEREFORE, in consideration of the premises and the mutual covenants herein contained, it is agreed as follows:

1. The joint Venturers are the owners of registered certificates of indebtedness issued by Sherwood Memorial Gardens, Inc., in the following units:

| Name: | Units |
|---|---|
| Jean Hope Meyer | 640 |
| A. Berkowitz | 200 |
| Universal Association | 75 |
| Edna Z. Beiner | 25 |
| Berkowitz, Newfield, Lefkovits & Paden | 60 |
| Total | 1,000 |

The aforementioned one thousand (1,000) units constitute the entire outstanding interests for which Sherwood Memorial Gardens, Inc., has agreed to issue registered certificates of indebtedness pursuant to the aforesaid Sherwood Memorial Gardens Agreement.

2. The promissory notes to be executed to A. Berkowitz by other joint Venturers are as follows:

| Name of maker: | Amount |
|---|---|
| Jean Hope Meyer | $8,400 |
| Universal Associates | 4,500 |
| Edna Z. Beiner | 1,500 |
| Berkowitz, Newfield, Lefkovits & Paden | 3,600 |

The aforesaid promissory notes shall be non-assignable and shall mature three (3) years after date, without interest.

3. Until such time as the aforesaid promissory notes are paid in full, registered certificates of indebtedness of the makers of said notes shall be assigned in blank and deposited in escrow with First Bank and Trust Company of South Bend, South Bend, Indiana, as escrow agent, for the following number of units, to wit:

| Name: | Units |
|---|---|
| Jean Hope Meyer | 140 |
| Universal Associates | 75 |
| Edna Z. Beiner | 25 |
| A. Berkowitz | 24 |
| Meyer U. Newfield | 14⅚ |
| Arnold Lefkovits | 10⅚ |
| Jack G. Paden | 10⅚ |
| Total | 300 |

The aforesaid promissory notes also shall be held in escrow by said escrow agent until the same have been paid in full. All amounts to which the makers of said notes may be entitled in connection with their pledged certificates of indebtedness shall be paid by Sherwood Memorial Gardens, Inc., to the said escrow agent while said pledge continues in effect, and the said escrow agent shall record the payments thus received as payments upon the respective promissory notes and thereupon pay over said sums to A. Berkowitz as the payee of said notes. When any such promissory note is paid in full, the pledged certificates of indebtedness of the maker of such note shall be released by the escrow agent and returned to the maker, together with the promissory note, duly cancelled.

Under the above joint venture agreement, the Birmingham group designated 60 percent of their original investment of $30,000, i.e., $18,000, ostensibly as loans to certain individuals. The loans were then used by the individuals to acquire certificates of indebtedness from petitioner. Notes were executed to represent the loans, and the certificates of indebtedness so acquired were placed in escrow to secure the loans. Payments made upon the escrowed certificates were to be credited by the escrow agent against the notes secured until such notes were satisfied, at which time the certificates were to be released from escrow. In this manner Jean Hope Meyer, Universal Associates, Edna Z. Beiner, and the law firm of Berkowitz, Newfield, Lefkovits, and Paden acquired a number of certificates for which they had made no actual cash outlay. In addition to the 140 certificates which she acquired in the above manner under the joint venture agreement, and in addition to the 200 certificates which she acquired in exchange for her initial capital contribution, Jean Hope Meyer also acquired 300 more certificates, without making any cash outlay, in the following manner. Of the $30,000 originally contributed by her to petitioner, she designated 60 percent, or $18,000, as a loan to herself. With this $18,000 loan she acquired 300 certificates, executing to herself a note to represent the loan. Some discussion was had between the parties relative to whether this transaction should be reflected in the joint venture agreement, but it was apparently decided that it should not be.

Copies of the notes referred to in the preceding paragraph were sent to Berkowitz for his inspection by Fred Meyer on October 10, 1955. The following is an excerpt from the letter enclosing said copies:

I enclose also carbon copies of five notes—one note made payable to my wife in the amount of $18,000.00 from herself as Class B joint venturer to her as Class A joint venturer (confusing isn't it?) ; a $8,400.00 note from my wife to you; a $3,600.00 note from A. Berkowitz, Class B joint venturer, to A. Berkowitz, Class A joint venturer [the maker of this note was later changed from A. Berkowitz to the law firm of Berkowitz, Newfield, Lefkovits and Paden who appear as makers of the $3,600 note referred to in the joint venture agreement] ; a $4,500.00 note from Universal Associates to A. Berkowitz; and a $1,500.00 note from Edcar Associates [presumably, Edna Z. Beiner, who is referred to in the joint venture agreement as the maker of this note, was ultimately substituted for Edcar Associates] to A. Berkowitz. The above notes complete the $36,000.00 notes due from Class B joint venturers to Class A joint venturers.[7]

On January 16, 1956, Berkowitz wrote to Meyer requesting him to forward the originals of the above notes. Meyer replied on February 27, 1956, as follows:

I am enclosing an escrow agreement[8] for the certificate of indebtedness between you, Universal Associates, Mrs. Beiner and 140 units of my wife's. * * *

I also enclose three-year non-assignable notes which are not the if, as and when notes originally prepared. These are bonified [sic] notes.

---

7 The $36,000 figure referred to represents 60 percent of the initial $60,000 in cash put up by the Birmingham group and Jean Hope Meyer (the Class A joint venturers) for which they received 40 percent of petitioner's certificates. The class B joint venturers received 60 percent of petitioner's certificates without putting up any cash for them.

8 See the following :

ESCROW AGENT'S RECEIPT

IN THE MATTER OF SHERWOOD MEMORIAL GARDENS, INC., KNOXVILLE, TENNESSEE

The undersigned, as Escrow Agent under that certain Joint Venture Agreement executed as of the 4th day of October, 1955, by Jean Hope Meyer, A. Berkowitz, Universal Associates, Edna Z. Beiner and Berkowitz, Newfield, Lefkovits & Paden, hereby acknowledges receipt of the following described non-assignable promissory notes dated October 4, 1955, payable to A. Berkowitz, three (3) years after date, without interest, to wit :

| Maker : | Amount |
|---|---|
| Jean Hope Meyer | $8,400 |
| Universal Associates | 4,500 |
| Edna Z. Beiner | 1,500 |
| Berkowitz, Newfield, Lefkovits & Paden | 3,600 |

The undersigned further acknowledges receipt of certificates of indebtedness of Sherwood Memorial Gardens, Inc., as follows, to wit :

| Registered Owner : | Otf. No. | No. of Units |
|---|---|---|
| Jean Hope Meyer | 4 | 140 |
| Universal Associates | 23 | 75 |
| Edna Z. Beiner | 22 | 25 |
| A. Berkowitz | 5 | 24 |
| Mayer U. Newfield | 6 | 14⅚ |
| Arnold Lefkovits | 7 | 10⅚ |
| Jack G. Paden | 21 | 10⅚ |

It is understood and agreed that said notes and certificates of indebtedness shall be held in escrow by the undersigned upon the terms and conditions of the aforesaid Joint Venture Agreement of October 4, 1955, a copy of which agreement has been delivered to the undersigned.

The certificates of indebtedness issued by petitioner are in the following form:

This is to Certify That _____ is entitled to an interest equal to _____ one-thousandths (_____/1000ths) of twenty-five per cent (25%) of the proceeds represented by the base sales price of all lots or graves in Sherwood Memorial Gardens sold during a period of fifteen (15) years from the sale of the first such lot or grave, as set forth in an agreement between Jean Hope Meyer and A. Berkowitz, as First Parties, and Sherwood Memorial Gardens, Inc., as Second Party, dated October 4, 1955, which agreement is incorporated herein by reference. Such proceeds shall constitute the land purchase fund of Sherwood Memorial Gardens, Inc., and shall be accumulated as provided for under Paragraph 4 of the aforesaid Agreement.

Sherwood Memorial Gardens, Inc., shall be liable to the registered holder of this certificate, and this certificate shall be a lien on such land purchase fund, to the extent of the interest represented by this certificate, and the registered holder of this certificate shall be entitled to have paid over to him such proportion of said fund as the number of units represented by this certificate bears to the total number of one thousand (1000) units.

Payments on account of this certificate of indebtedness shall commence on April 15, 1956, and shall be made at least quarterly thereafter, and shall continue only for such period of time as is necessary to pay out in full the amount accumulated in the land purchase fund. After all such payments are made, the liability of Sherwood Memorial Gardens, Inc., under this certificate of indebtedness shall terminate, and the obligation represented by this certificate shall be discharged.

This certificate is transferable only on the books of Sherwood Memorial Gardens, Inc., by the registered holder hereof in person or by attorney, on surrender of this certificate properly endorsed.

On November 17, 1955, certificate No. 2, encompassing 200 units was transmitted by Fred Meyer to A. Berkowitz. This certificate was dated October 5, 1955,[9] and was supposed to represent the 200 certificates to which the Birmingham group was entitled in exchange for its contribution of 50 percent of petitioner's initial capital. Certificate No. 2 was thereafter returned to petitioner, and in its place certificates were issued to the individual members of the Birmingham group representing the proportionate interest of each. These certificates were all dated October 6, 1955, although they were not issued on that date.

Petitioner has neither paid nor declared any formal dividends during the years here in issue. Petitioner had the following amounts of gross receipts from the sales of burial space in the years indicated:

| Fiscal year ending Sept. 30: | Amount |
|---|---|
| 1957 | $183,372.25 |
| 1958 | 189,267.38 |
| 1959 | 97,935.31 |

[9] All of petitioner's certificates are dated either Oct. 5 or Oct. 6, 1955. The evidence, however, establishes that the certificates had not even been printed as of that date. On Nov. 2, 1955, Meyer advised Berkowitz by letter that the certificates had been returned from the printers and would be forwarded to him as soon thereafter as Meyer could obtain the corporate seal from petitioner's office in Knoxville.

During these same years petitioner's books and records indicate the following amounts as "Obligation to Certificate of Indebtedness" holders:

| Fiscal year ending Sept. 30: | Amount |
|---|---|
| 1957 | $33, 877. 41 |
| 1958 | 34, 324. 15 |
| 1959 | 18, 207. 35 |

The *actual* amounts which were distributed by petitioner to its certificate holders during the period 1957 through 1959 were as follows:

| Fiscal year ending Sept. 30: | Amount |
|---|---|
| 1957 | $8, 700 |
| 1958 | 37, 100 |
| 1959 | 31, 050 |

Based on the above payment schedule, Jean Hope Meyer recovered her initial investment in petitioner by March 27, 1958, while the Birmingham group had recouped theirs no later than February 4, 1959.

In each of its fiscal years 1957, 1958, and 1959, petitioner deducted as a cost of operations under the heading "Land" the following amounts:

| Fiscal year ending Sept. 30: | Amount |
|---|---|
| 1957 | $33, 877. 41 |
| 1958 | 34, 324. 15 |
| 1959 | [1] 18, 207. 07 |

[1] The actual figure deducted by petitioner on its fiscal 1959 return under the heading "Land" was $25,739.27. However, the parties have stipulated that this figure "included $7,532.20 claimed by petitioner for 'improvements,' although said figure was not separately stated on the return, which represented actual development expenses paid out by petitioner during the taxable year." The amounts deducted by petitioner in the fiscal years 1957 and 1958 are the exact figures accrued by petitioner on its books as "Obligation to Certificate of Indebtedness" holders. Presumably, the figure for 1959 likewise had this origin.

In his notice of deficiency respondent disallowed the above deductions with the following explanation:

It is determined that payments made in respect to the Certificates of Indebtedness and deducted as the cost of land, represent distributions made with respect to equity capital. Such payments are not land costs deductible under section 162(a), or any other section of the Internal Revenue Code of 1954.

In addition to paragraph 7 of the first agreement (providing that petitioner would set aside 15 percent of the base sales price of all lots sold as a reserve for physical development of its cemetery during the 15-year life of the first agreement) petitioner's sales agreements with lot purchasers contained the following representation:

That within ____ years from the date hereof, if not previously done, it [i.e., petitioner] will design and construct a Garden or Gardens, containing special landscaping, art and architectural features, from which Purchaser may select a plot * * *.

In 1955 petitioner employed a landscape architect to make an individual detailed map for the Garden of Nativity, the first of its six gardens, or areas, planned to be developed. Between February and June 1956 similar individual landscape maps were prepared for three additional gardens, the Masonic, Devotion, and Everlasting Life. Thereafter, in August 1956, an overall landscape map was prepared incorporating proposed improvement and development of petitioner's entire cemetery. Further individual landscape maps were prepared for the remaining two gardens (Meditation and Apostles) in May and June of 1959. All of the maps referred to were publicly recorded. Although each of the maps contains some landscape detail, their primary purpose appears to be the demarcation of lots and section lines in order to facilitate the conveyance of plots. In September of 1960 petitioner's landscape architect estimated the total expenditure which would be required to develop its entire cemetery in accordance with the plans which had previously been prepared. When divided by the number of spaces available for sale, the resulting figure is $13.62 per lot.

On its return for the taxable year 1957 petitioner deducted as a cost of its operation improvements in an amount representing 15 percent of its cash and installment sales of burial lots made during that year. For the taxable year 1958 petitioner claimed no costs for improvement or development. On its return for taxable 1959 petitioner in effect claimed as a cost of operation improvements in the amount of $7,532.20, such costs allegedly representing actual development expense paid during that year.

In his notice of deficiency respondent determined that the measurement of petitioner's development cost should be the *actual* expense incurred for such development during the taxable year. This actual cost was then taken into account by increasing petitioner's basis for each lot sold during the taxable year in an amount equal to the actual cost divided by the total number of burial plots available for sale in the cemetery.

**OPINION**

*Issue 1*

For the years 1957, 1958, and 1959 respondent has disallowed, as the cost of land, payments made by petitioner to its certificate-of-indebtedness holders on the ground that such payments do not represent the cost of procuring cemetery land but rather are distributions made by petitioner in respect to the equity investment of its certificate holders. Petitioner contends in opposition that its certificates represent a bona fide indebtedness incurred in the purchase of its cemetery property, payments upon which go to reduce its outstanding liability and increase its basis in the land purchased.

The issue presented by these opposing positions has been referred to by various courts, including this one, as one of "debt versus equity," "sale versus no sale," or "notes versus stock." Although the labels are different, the question is the same and in the last analysis the facts, rather than the form in which the parties cast their transaction, must control our decision.

At the outset, we observe that this case contains a somewhat unusual aspect—viz, the respondent is seeking to characterize as equity capital sums of money and property advanced to a corporation by individuals who are not stockholders of record of such corporation. While this contention may be unusual, it is not without precedent. *Foresun, Inc.,* 41 T.C. 706 (1964). Cf. *Zephry Mills, Inc.* v. *Commissioner,* 279 F. 2d 494 (C.A. 3, 1960), affirming a Memorandum Opinion of this Court. Moreover, the Internal Revenue Code itself recognizes that nonshare-holders may make capital contributions to corporations. In section 362(c) thereof it is provided that if property other than money is contributed to the capital of a corporation, and if it "is not contributed by a shareholder as such, then the basis of such property is zero." We recently applied this section in *Veterans Foundation,* 38 T.C. 66 (1962), affd. 317 F. 2d 456 (C.A. 10, 1963), wherein we held that articles of clothing and appliances, contributed to the taxpayer by members of the general public, were contributions to the taxpayer's capital. See also *Brown Shoe Co.* v. *Commissioner,* 339 U.S. 583 (1950). In light of these and other authorities, it is our view that advances by Jean Hope Meyer and the Birmingham group may be characterized as contributions of equity capital—assuming the surrounding factual circumstances justify such characterization— notwithstanding the fact that neither Jean Hope Meyer nor the Birmingham group were shareholders of record.

We turn now to a determination of whether, under the particular facts and circumstances of this case, the advances of money and property to petitioner by Jean Hope Meyer and the Birmingham group represented loans or whether they were contributions of equity capital.

As a first proposition, petitioner maintains that its certificates of indebtedness are in form debt instruments and as such create a valid debtor-creditor relationship between itself and the holders thereof. Even were we to assume the perfection of the certificates as debt instruments, we would not be bound by the mere form thereof, but would be entitled to inquire into the substance of the transaction underlying their issuance in order to determine whether the real intention of the parties is consistent with the purport of such instruments. *Gooding Amusement Co.,* 23 T.C. 408 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956). However, petitioner's certificates are not perfect debt instruments; they neither provide for the unconditional payment of any fixed sum

to the holders thereof nor do they provide for the payment of any interest upon what is designated indebtedness. Moreover, there is no way of ascertaining from the certificates of indebtedness (or from the first agreement which gave rise to their issuance) the principal amount of petitioner's purported obligation. To the extent that petitioner *is* obligated upon its certificates of indebtedness, it is obligated only for a percentage of its sales (assuming such sales occur), and in no event is it bound to repay the funds initially furnished to it. It is well settled that "the classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof." *Gilbert* v. *Commissioner*, 248 F. 2d 399 (C.A. 2, 1957). While *some* variation from this formula would not be fatal to petitioner's effort to have the advances of its certificate holders treated as a debt for tax purposes, the substantial variation here involved, if not preclusive of such treatment, at least casts doubt upon the wisdom of its application.

Secondly, petitioner has characterized the acquisition of its initial assets as a sale and purchase, its certificates of indebtedness representing promises to pay for the assets transferred. In this connection, it is observed that petitioner was organized with a paid-in capital of $1,000, the minimum amount with which a corporation may be formed under Tennessee law. The evidence clearly indicates that this sum was inadequate for the purpose of commencing a cemetery business. It is obvious that the contribution of initial assets, including land and cash, by Jean Hope Meyer and the Birmingham group, was necessary to begin the operation of petitioner's cemetery business, for without the transfer of these assets petitioner would have been a mere shell—its paid-in capital of $1,000 being manifestly insufficient to purchase its cemetery property and construct improvements thereupon. Certainly, a material factor in determining whether a bona fide sale and purchase has taken place (and whether a debtor-creditor relationship is or is not present) is the obviously inadequate capitalization of petitioner. *John Kelley Co.* v. *Commissioner*, 326 U.S. 521 (1946).

Moreover, while there is no question that the transfer of its initial assets (i.e., land and cash) served to vest in petitioner good and sufficient title to the same under the common law, a sale for *tax* purposes (which are concerned with economic realities) encompasses more than the bare transfer of legal title. What is required is a meaningful economic transfer, and we find such a meaningful transfer lacking in the present case. Petitioner contends that its certificate holders were, in essence, creditors. Although, as noted, the certificates contain no obligation to pay a fixed principal amount, the certificate holders advanced to petitioner money and property having an aggre-

gate value of $60,000 and we believe it appropriate to contrast this figure with petitioner's formal capital of $1,000. Such a contrast reveals the patently "thin" nature of petitioner's capital structure. In determining whether the transfer of property to a so-called thin corporation constitutes a sale or a mere contribution to capital, we consider one of the critical factors to be the anticipated source of payments to the transferors. *Bruce* v. *Knox*, 180 F. Supp. 907 (D. Minn. 1960). In the instant case the only source of payments to Jean Hope Meyer and the Birmingham group was out of the base sales price of lots to be sold by petitioner. In the absence of such sales, these payments could not be made. Thus, whatever obligation petitioner had to those who furnished it with its initial assets was dependent upon and at the risk of its cemetery business. As we view them, such obligations were "a participation in the pot luck of the enterprise." *Aqualane Shores, Inc.* v. *Commissioner*, 269 F. 2d 116 (C.A. 5, 1959), affirming 30 T.C. 519 (1958).[10]

A further factor bearing on this transaction is the obvious opportunity for tax avoidance presented by it. This opportunity arises, in part, from the fact that petitioner has been deducting the payments made by it to its certificate holders as the cost of land, thus increasing its basis in said land. This increase in basis is calculated to decrease the anticipated profit from the sale of plots which would be taxable at ordinary income rates. By the same token, a device is provided by which the certificate holders might withdraw from petitioner all payments made to them at capital gains rates. While the mere fact that the purpose of a transaction may be to minimize taxes does not of itself render the transaction ineffective if it is in all other respects bona fide, a tax-avoidance purpose is a substantial factor to be considered in determining whether the transaction lacks genuineness. On all of the facts it is difficult for us to see any other reason for arraying the transfer of $60,000 in cash and property to a corporation having a formal capital of $1,000 in the clothing of a debt *except* for the tax advantage to be gained from the successful execution of such a scheme. We are confirmed in this view, notwithstanding petitioner's having pointed out the ancient use of land shares in the acquisition of cemetery property. Perhaps years ago the land share method of procuring cemetery property was the only way in which such property could be gotten because of the very slow and unprofitable nature of

---

[10] In opposition to this view, petitioner points out that those who advanced funds and property to it were in a position no different than the ordinary creditor, whose risk is simply that of not being paid if the business fails and who looks to the assets of the business for security. However, what we are referring to here as having been assumed by Jean Hope Meyer and the Birmingham group is not the creditor's risk that the business will fail and be unable to meet its debts but the *entrepreneurial* risk that the business will *prosper* as well as endure.

sales in the cemetery business. But these are modern times and the tax law must be sufficiently flexible to cope with them. No longer is the burial of the dead the exclusive province of the community, but fortunes are daily reaped from such activities by many private individuals.[11] Under such circumstances we see little business purpose in characterizing as loans advances clearly placed at the risk of a new enterprise.

On the basis of the foregoing discussion, and applying the recognized criteria to the facts and circumstances of this case, it is our opinion that no debtor-creditor relationship existed between petitioner and its certificate holders and that the transfer to petitioner of land and cash by Jean Hope Meyer and the Birmingham group did not amount to a sale. We are therefore convinced that petitioner's certificates, far from evidencing a bona fide indebtedness, actually evidence a proprietary equity in petitioner not unlike preferred stock.

Petitioner, however, vigorously denies that its certificates may be viewed as stock. In this endeavor, its principal reliance is placed upon two State court decisions, involving generally the area of creditors' rights, and three decisions of this Court two of which have to do with tax-exempt cemetery corporations. *Am. Exch. Nat. Bank* v. *Woodlawn Cemetery*, 194 N.Y. 116, 87 N.E. 107 (1909), reversing 120 App. Div. 119, 105 N.Y. Supp. 305 (1907) ; *Gregory* v. *Chapman*, 119 Md. 495, 87 Atl. 523 (1913) ; *Kensico Cemetery*, 35 B.T.A. 499 (1937), affd. 96 F. 2d 594 (C.A. 2, 1938) ; *Forest Lawn Memorial Park Association, Inc.*, 45 B.T.A. 1091 (1941) ; and *Howard Carleton Avery*, 13 T.C. 351 (1949). We find each of these cases to be distinguishable on its facts from the instant one. *Am. Exch. Nat. Bank* involved the question of whether certificates, issued by a nonprofit New York membership corporation, could be viewed as stock for the purpose of determining whether such certificates possessed limited negotiability. In holding that the certificates were not stock, the New York Court of Appeals relied primarily on the fact that the cemetery was a nonprofit *membership* (i.e., nonstock) corporation, thus "[it] could not issue certificates of stock as might stock corporations, for [it] had no capital stock." Petitioner in the instant case is under no such disability, being, as it is, a general Tennessee for-profit stock corporation. *Gregory* v. *Chapman* involved a question of the preference in bankruptcy of certain holders of certificates issued by a Maryland cemetery corporation. In finding the certificate holders to be creditors rather than stockholders, the Maryland Court of Appeals pointed out the nonprofit, *nonstock* nature which the cemetery corporation had under its charter. While this factor alone would serve to distinguish *Chapman* from the instant case, we observe that the Maryland court went

---

[11] See, in this connection, Mitford, The American Way of Death (1963), especially ch. 9, entitled "God's Little Million Dollar Acre."

on to state, "the ability of the [cemetery] company to discharge its contractual duty [viz, to "repay" advances] to the holders of [its] land certificates was absolutely dependent upon its success in selling the lots with the requisite facility." Although the placing of funds by an investor at the risk of success of a business may be a criterion for debt treatment in Maryland, as we have pointed out *supra*, just the opposite is true for Federal income tax purposes—which purposes are not to be circumscribed by State law. *Weller* v. *Commissioner*, 270 F. 2d 294 (C.A. 3, 1959), affirming 31 T.C. 26 and 31 T.C. 33. See also *Haffenreffer Brewing Co.* v. *Commissioner*, 116 F. 2d 465 (C.A. 1, 1940).

In *Kensico Cemetery*, the Commissioner argued that land share certificates, issued by a New York nonprofit membership cemetery corporation, were stock, that distributions made with respect to such certificates were dividends, and that a part of the net earnings of the cemetery corporation were thus inuring to the benefit of private individuals. Relying principally on *Am. Exch. Nat. Bank* v. *Woodlawn Cemetery, supra*, we pointed out the disability of Kensico cemetery to issue stock, thus destroying the predicate upon which the Commissioner's argument was based.[12] *Forest Lawn Memorial Park Association, Inc.*, involved a California nonprofit nonstock cemetery corporation whose exemption from tax was questioned on the ground that a part of its net income was inuring to the benefit of private shareholders. We specifically found that the California statute permitting the organization of such cemetery corporations prohibited the distribution of gains, profits, or dividends to members thereof. Petitioner in the instant case is neither nonprofit, nonstock, nor is it under any prohibition from distributing its earnings to those who have an equity investment in it. It occupies a position which clearly is distinguishable from that of *Forest Lawn*. Finally, in the *Avery* case (which involved solely the issue of whether there could be a partial retirement of the type of certificate described by section 117(f) of the 1939 Code (now section 1232 of the 1954 Code)) the Commissioner conceded the very point which he has here placed in issue, viz, that the certificates involved were bona fide evidences of indebtedness. Although the *nature* of the certificates (whether debt or stock) was *not* placed in issue in *Avery*, we there pointed out the disability of Maple Grove Cemetery Association which was a nonstock New York membership cemetery corporation, to issue stock, citing *Am. Exch. Nat. Bank* v. *Woodlawn Cemetery, supra*.

---

[12] It is to be noted that the New York Membership Corporation Law involved in both *Kensico* and *Am. Exch. Nat. Bank*, which permitted land to be transferred to a cemetery corporation in return for up to half of the gross receipts from the sale of cemetery lots, has now been changed. Due to extensive profiteering and other abuses, this authority was revised in 1949 (see N.Y. Membership Corp. Law, sec. 87) so as to forbid cemetery corporations from paying more than the fair and reasonable market value of the land purchased, with the terms, method of payment, and price to be subject to court approval.

Accordingly, our decision on this first issue is that payments made by petitioner to its certificate holders and deducted by it as the cost of land are neither deductible land costs nor proper adjustments to its basis [13] for such land, but were in fact nondeductible distributions made in respect to the equity investment which such certificate holders had in petitioner.

*Issue 2*

What is at issue here is both the method of determining petitioner's development costs and the way in which such costs should be taken into account.

Petitioner initially contends that since under the first agreement it was required to accumulate and deposit in a separate bank account 15 percent of the base sales price of all burial lots sold as a fund for the development and improvement of its cemetery, it is entitled to exclude such 15 percent from its gross income. The law, however, is otherwise, for it has long been held that where a fund is established by contributing a percentage of sales price of cemetery lots and the fund is to be devoted to development and improvement consistent with establishing and carrying on the cemetery enterprise, the amounts that go into the said fund will be gross income to the cemetery. *Memphis Memorial Park*, 28 B.T.A. 1037 (1933), affirmed per curiam 84 F. 2d 1008 (C.A. 6, 1936); *National Memorial Park* v. *Commissioner*, 145 F. 2d 1008 (C.A. 4, 1944), affirming a Memorandum Opinion of this Court; *Gracelawn Memorial Park* v. *United States*, 260 F. 2d 328 (C.A. 3, 1958). While the existence of two exceptions to this rule has been hinted at, e.g., where the fund constitutes a "definitely established" trust, see *Memphis Memorial Park*, *supra*, but see *Gracelawn Memorial Park* v. *United States*, *supra*, or where the fund was accu-

---

[13] In this connection, we are persuaded that the series of transfers, whereby petitioner was formed and provided with its initial assets, was equivalent, for tax purposes, to a single integrated transaction covered by the provisions of sec. 351(a) of the 1954 Code. As we have pointed out, petitioner was formally organized on Sept. 2, 1955, with a nominal capitalization of $1,000. Its purpose, as stated by its articles of incorporation, was the acquisition, development, and operation of land to be used exclusively as a cemetery for the burial of the dead. Since, as we have found, petitioner's formal capitalization was inadequate to carry out the purpose for which it was formed, petitioner remained in the organic or embryonic state until such time as it received from Jean Hope Meyer and the Birmingham group land and sufficient capital to embark upon its chartered course. Therefore, as we view them, the transaction by which Fred W. Meyer, Jr., provided petitioner with the minimum amount for incorporation and received in exchange 998 of its 1,000 shares of voting common stock and the transaction by which Jean Hope Meyer and the Birmingham group furnished petitioner with its cemetery land and cash in exchange for certificates evidencing a proprietary interest in the nature of preferred stock were merely related steps in a single integrated transaction whereby "property [was] transferred to a corporation solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons [were] in control of the corporation." Under sec. 362 the basis of property received in a sec. 351 exchange is determined by reference to the basis of such property in the hands of the transferor. Accordingly, petitioner's basis for its cemetery land is $30,000, the same basis which such land had in the hands of Jean Hope Meyer and Abe Berkowitz.

mulated as the result of a *specific* obligation to lot purchasers, see *National Memorial Park* v. *Commissioner, supra,* we think petitioner qualifies for neither of them.

Alternatively, vis-a-vis the 15 percent figure, petitioner maintains that if such amount is not excludable from its gross income, then it is deductible as a development expense which is required to be accrued under the first agreement. We disagree. Taxpayers, such as petitioner, who utilize the accrual method of accounting are permitted deductions in the taxable year "in which all of the events have occurred which establish the fact of the liability giving rise to such deduction and the amount thereof can be determined with reasonable accuracy." Sec. 1.446-1(c)(1)(ii), Income Tax Regs. In the instant case, petitioner has failed to establish "the fact of the liability" giving rise to the deduction claimed. Although the first agreement contains language typical of a binding contract between strangers, the evidence tends to show that it really amounts to no more than a convenient compact between parties who were entering the cemetery business as a joint venture or enterprise. However, a finding of the exact nature of the relationship of the parties to the first agreement is not necessary since our decision on the first issue establishes the infirmity of that agreement to fix obligations which will have reality for petitioner's tax computation.

Petitioner makes the further alternative argument that if the 15-percent figure is neither excludable nor deductible from its gross income, then the allocable *estimated* cost for development and improvement of each burial lot should be included in the cost of each lot sold during the taxable years. Of this contention it is sufficient to say that we have consistently rejected it. *Memphis Memorial Park* and *National Memorial Park,* both *supra.* Our view was more recently reiterated in *Mount Vernon Gardens, Inc.,* 34 T.C. 598 (1960), but reversed 298 F. 2d 712 (C.A. 6, 1962) on this issue. With all due respect to the decision of the Court of Appeals for the Sixth Circuit, we are inclined to adhere to our previous position. Moreover, in *Mount Vernon Gardens* the Court of Appeals found that the development funds were "impressed with an irrevocable trust to be used for improvements and will never revert to the taxpayer." That is not the situation here. As we said in *Memphis Memorial Park:* "Nor do we think that petitioner's estimate of the cost of the contemplated improvements should be added to the cost of the plots in advance of expenditures made therefor."

Finally, petitioner contends that "if only actual expenditures as opposed to estimated expenditures are to be allocated over the burial spaces available and thereafter sold * * *, then the allocation should not be made over the entire cemetery as a whole * * *, but the allo-

cation should be made as to expenditures for each of the six gardens actually under development and this allocation [should] be limited to each separate garden."

As we view the evidence on this issue, petitioner is in the business of operating a *single* cemetery not six contiguous cemeteries. Improvements made in any one part of the cemetery benefit all parts of the cemetery. This is true of its roadways, gateway, statues, and other appurtenances of an ornamental nature. We agree with respondent that the cost of such improvements should be allocated over petitioner's *cemetery*, not merely over parts thereof.

Reviewed by the Court.

*Decision will be entered under Rule 50.*